# Illinois Official Reports

## Appellate Court

***People v. Temple*, 2014 IL App (1st) 111653**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL TEMPLE, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-1653 |
| Filed | June 27, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for one count of first degree murder and attempted first degree murder were upheld on appeal, one conviction of first degree murder was vacated pursuant to the one-act, one-crime rule and his conviction for aggravated battery with a firearm was vacated as a lesser included offense of attempted first degree murder, regardless of defendant's contentions that prior inconsistent statements of witnesses were improperly admitted, that improper hearsay testimony was admitted from police officers, that the prosecution improperly distorted the burden of proof and bolstered its evidence during rebuttal and that the identification evidence was insufficient, since the evidence against defendant, including the identification testimony of three eyewitnesses and the physical evidence connecting defendant to the crimes, was overwhelming. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-16109; the Hon. Evelyn B. Clay, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; mittimus corrected. |

Counsel on         Abishi C. Cunningham, Jr., Public Defender, of Chicago (Eileen T.
Appeal             Pahl, Assistant Public Defender, of counsel), for appellant.


                   Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg,
                   Michelle Katz, Kathleen Warnick, and Margaret G. Lustig, Assistant
                   State's Attorneys, of counsel), for the People.




Panel              JUSTICE McBRIDE delivered the judgment of the court, with
                   opinion.
                   Presiding Justice Gordon and Justice Palmer concurred in the
                   judgment and opinion.

## OPINION

¶ 1    Following a jury trial, defendant Michael Temple was found guilty of two counts of first degree murder, and one count each of attempted first degree murder, and aggravated battery with a firearm. The trial court sentenced defendant to two concurrent sentences of 45 years for the murder convictions, to run consecutive to two concurrent sentences of 31 years for the attempted murder and 30 years for the aggravated battery with a firearm conviction. On appeal, defendant contends: (1) the trial court erred by admitting prior consistent statements or, in the alternative, defense counsel was ineffective for failing to object to the State eliciting prior consistent statements from its witnesses; (2) the trial court erred by admitting improper hearsay from the testifying police officers; (3) the prosecutor improperly distorted the burden of proof and unfairly bolstered its own evidence during rebuttal argument; (4) the identification evidence was insufficient to prove defendant guilty beyond a reasonable doubt; and (5) the mittimus must be corrected because defendant was improperly convicted for more than one offense arising out of the same acts. We affirm in part, vacate in part, and correct the mittimus.

¶ 2    At trial, Jesus Patino testified that at approximately 8:25 p.m. on August 10, 2009, he was walking north on Calhoun Avenue toward 107th Street with his brother, Ulises Patino, Alejandra Gonzalez, and Israel Negrete. They were walking a dog and, while they were walking, Patino saw a car "kind of speeding" toward Calhoun. Patino told his friends to "look out for the car because it looks suspicious." As the car approached the stop sign it slowed down, then sped up again and "that's when a shot was fired. " Patino observed a Caucasian arm hanging out of the driver's side window with a gun, heard a gunshot, and then saw sparks. Patino recognized the driver and shooter as Michael Temple, the defendant, but not until after the first shot. Patino recognized defendant because they used to go to school together, although they were not friends. Patino was about 40 to 45 feet away when he identified defendant; the sun was still out, the streetlights were just turning on, no cars were parked on the street, and nothing blocked Patino's view of defendant. Three African American men rode in the car with defendant but defendant was the only person Patino saw firing a gun. After the first shot,

Patino turned and ran south on Calhoun. He heard eight to ten additional gun shots but he did not look back until he no longer heard gunshots. Then he stood up and saw the car turn left onto Bensley Avenue. Ulises and Negrete had both been shot. Patino called 9-1-1 for an ambulance, and also gave a description of the vehicle: a four-door, light blue Oldsmobile Cutlass that drove toward Bensley and 107th, where the Trumbull Homes are located. When the police arrived, Patino told them that defendant was the shooter, identifying him by the name Michael Temple, and that defendant went by the nicknames of White Boy Slim and Snowflake. Patino also told the officers that the car used in the shooting was a four-door Oldsmobile Cutlass. Ulises and Negrete were both taken to the hospital. At some point, Patino learned Ulises passed away.

¶ 3    At approximately 12:35 a.m. on August 11, 2009, the police took Patino and Gonzalez to Oglesby Avenue and 104th Street, about three blocks north of the intersection where the shooting had occurred. There, Patino recognized the vehicle from which he had seen defendant firing. Patino also identified a photo of the car in open court as the car used in the shooting. Patino then spoke with detectives and identified a photo of defendant as the shooter because defendant was the person Patino saw firing the gun toward them.

¶ 4    On cross-examination, Patino admitted that he had not seen defendant in three or four years prior to the shooting. Patino testified that, at the time of the shooting, defendant was wearing a white, short-sleeved shirt and was clean-shaven. Patino did not tell the police that defendant had a beard and defendant also had a beard in the photo that the police showed to Patino. Patino testified that, just a few hours after the shooting, he told the detectives that interviewed him that he saw a car driving slowly on 107th from Hoxie Avenue and, as he and his friends reached the intersection, he told his friends to turn and walk back the other way. Then the car sped up to the intersection. He did not remember whether he told the detectives that he began to get on the ground by a tree when the gunshots were fired, but he was not on the ground when the first shots were fired. Patino also testified on cross-examination that he saw defendant fire the first shot, and then he went down to the ground and heard more shots fired.

¶ 5    Alejandra Gonzalez substantially corroborated Patino's testimony. She testified that at approximately 8:25 p.m. on August 10, 2009, she was walking north on Calhoun with Patino, Negrete, and Ulises. When they were at the intersection of 107th and Calhoun, Gonzalez heard Patino say to watch out for a car. She looked at the car, which was driving slowly west on 107th. Gonzalez described the car as an "older model ***, a four door, like a grayish, bluish, midnight blue color." It was "slowly approaching the middle of the street, and then once it comes to a stop, it then starts to drive off." After the car passed through a stop sign, Gonzalez heard gunshots coming from the driver's side of the car. She heard a gunshot, and then saw the gun being fired. She saw a white male hand pointing out the driver's side window toward them. She saw the shooter's face for "[a] little more than half a minute" but she did not know who he was at the time. He was wearing a white T-shirt and no hat. Gonzalez identified defendant as the shooter in open court. She was three to five feet away from the car when she saw defendant's face and nothing was blocking her view, and Patino was standing three or four feet behind her. Gonzalez heard four or five additional shots after the first shot and the car kept moving west. "And then my body [was] dragged to the ground because I [heard] the gunshots. So I [fell] down to the ground." When the shooting was over, she turned her attention to Ulises and eventually went to the hospital with Ulises. Gonzalez eventually learned that Ulises passed away.

¶ 6    At 12:35 a.m. on August 11, 2009, Gonzalez went to 10431 South Oglesby with a police officer and Patino, where she saw the car that was used in the shooting. At approximately 12:40 a.m. on August 12, 2009, Gonzalez went to the police station and identified defendant as the shooter in a lineup. Before viewing the lineup, a detective told Gonzalez that the suspect may or may not be in the lineup and that she was not required to make an identification.

¶ 7    On cross-examination, Gonzalez said she had seen defendant once or twice prior to the night of the shooting around the neighborhood. She did not recall when she had seen him before but she never talked to him and had not been in the same place with him for more than a minute. Gonzalez never saw defendant leave the car. The car moved the entire time the shooting was occurring. Gonzalez saw defendant for the first time when Patino told her to watch out for the car. When Gonzalez spoke with the detectives, she believed she told them that she saw the shooter's face before the shooting began. She described the car as midnight blue, but when asked whether midnight blue was a dark color she said she "wouldn't think so." In regard to the car she identified as the shooter's car, the following exchange occurred:

> "DEFENSE COUNSEL: Is that a car that's colored midnight blue?
> WITNESS: Well, now that you–no, but in my understanding, it's yes. But to answer your question, no.
> DEFENSE COUNSEL: Would midnight blue be a darker blue, Miss Gonzalez?
> WITNESS: Yes."

Gonzalez also admitted that at some point before she viewed the lineup, Patino told her defendant was the shooter. Defendant did not have a beard at the time of the shooting but was "probably a little scruffy."

¶ 8    On redirect-examination, Gonzalez said she turned her back during the second round of shots, so she did not know if defendant exited the vehicle while her back was turned. No one told Gonzalez who to identify in the lineup and no one told her what defendant looked like before she viewed the lineup. Gonzalez also testified that she did not identify defendant because Patino told her defendant was the shooter, she identified defendant because he was the person she "saw with [her] own two eyes."

¶ 9    Israel Negrete substantially corroborated the testimony of Patino and Gonzalez. He testified that at about 8:25 p.m. on August 10, 2009, they were walking a dog with Ulises toward 107th and Calhoun. As they reached the intersection, Patino told them to watch out for a car that Negrete described as having four doors and being a "bluish-gray color." Negrete looked at the car for "a couple of seconds," but did not pay attention, then turned around because the dog pulled on the leash, which he was holding. Negrete then turned and started walking the dog back, and then he heard gunshots. He turned and saw the gunshots were coming from the driver's side of the car because he saw flashes. He heard two gunshots, looked back, started running without paying attention to see who was shooting, and heard "like six" more shots. Negrete could not see the face of the person shooting from the car. He ran toward a tree and tried to take cover but he got shot. After the car left, Negrete realized he had been shot so he sat down on the curb. Ulises was on the ground. An ambulance arrived after about 15 minutes and Negrete was taken to the hospital. Negrete suffered gunshot wounds in each arm and on his ribcage and he had two surgeries as a result of his wounds.

¶ 10   On cross-examination, Negrete said he could not recall whether there were cars parked on Calhoun at the time of the shooting. Negrete was not sure how many people were in the car and

did not know whether they were black, white, or Hispanic. He was about 12 feet away from the car when the gunshots started.

¶ 11    Maria Tellez testified that on August 10, 2009, she was living at 10656 South Hoxie. At approximately 8:25 p.m., she heard gunshots coming from the direction of 107th and Calhoun. She heard four shots, a pause, and then three more shots. Tellez went to her back door and looked west, where she saw a Caucasian male get into the driver's side of a "light-colored vehicle" on the corner of 107th and Calhoun. The car then drove west toward Bensley, where the Trumbull Park Homes are located.

¶ 12    On cross-examination, Tellez testified that she was questioned the evening of the shooting by Detective Eberle. She said she believed she told him that she saw a white male and she saw a car pull away. On another night, when three detectives came to her home, she told them that she saw a white male when she looked out her window. Tellez did not recall what the white man was wearing and she did not see his face.

¶ 13    Officer Assata Olugabala testified that at approximately 8:32 p.m. on August 10, 2009, she and her partners received a "shots fired call" in the vicinity of 107th and Calhoun. When they arrived at the scene, she observed two injured Hispanic males and a few other witnesses in the area. Olugabala spoke with Gonzalez at the scene and the following exchange occurred:

> "STATE: What information did you receive?
> DEFENSE COUNSEL: Objection, it calls for hearsay.
> STATE: I'm not asking for details.
> THE COURT: Is this course of–
> STATE: Investigation, your Honor, what they did next.
> THE COURT: I will allow this for that limited purpose.
> STATE: I could lead if you'd like, which would get us through.
> DEFENSE COUNSEL: That would be fine.
> THE COURT: Very well."

Gonzalez gave Olugabala information about the direction the car had gone and gave a description of the man involved in the shooting. Olugabala was present when her partners spoke with Patino, who provided a name and nickname for the shooter and gave a description of the vehicle involved. After receiving information from the witnesses, a flash message was sent out to be on the lookout for a white man named Michael Temple who had a nickname of White Mike.

¶ 14    Officer Lorenzo Colucci testified that at about 8:30 p.m. on August 10, 2009, he responded to a call of shots fired near 107th and Calhoun. He was monitoring the radio and received information including a description of the vehicle used in the shooting, that the vehicle fled westbound after the shooting, and subsequently received the name of the suspect wanted in connection with the shooting. Colucci obtained the "last whereabouts" of the suspect, which was on the "105th block of South Yates [Avenue]." At approximately 8:45 p.m., Colucci proceeded to the area of 104th and Oglesby, near the suspect's last whereabouts, where he saw a vehicle matching the description of the offender's vehicle, a 1995 Oldsmobile Cutlass Sierra with the windows rolled down. The vehicle identification number was 1G3AJ55M1S6352272. No one was inside the car. Colucci gave the plate number and location of the vehicle to 9-1-1 dispatch, and then learned the registered owner of the vehicle was Sharon Monok and that she

resided at the same place that was listed as the residence listed for the offender they were seeking.

¶ 15    The State then introduced a certified copy of the vehicle record for the recovered 1995 Oldsmobile Cutlass, with vehicle identification number 1G3AJ55M1S6352272, reflecting a single owner by the name of Sharon Monok.

¶ 16    Detective Brian Forberg testified that at approximately 9 p.m. on August 10, 2009, he and his partner Detective Eberle were assigned to go to the location of 107th and Calhoun. Upon arriving, Forberg observed blood on the curb approximately 15 to 20 feet south of the intersection and expended cartridge cases on the street just west of the intersection. No victims or witnesses were present at the time. Forberg received information from the tactical officers on the scene that one of the witnesses, Patino, had identified the offender by name, Michael Temple, and given a description of the vehicle that the offender had been driving.

¶ 17    On August 11, at about 12:35 a.m., Forberg testified that he went to the area of 104th and Oglesby, where he met Patino and Gonzalez. Responding units had located a vehicle matching the description of the offender's vehicle provided by the witnesses. Patino and Gonzalez were brought together in the same car, and then taken out of the car individually to view the vehicle. Patino and Gonzalez both identified the vehicle to Forberg and Eberle as the vehicle used during the shooting. At approximately 1:25 a.m., Forberg interviewed Patino to get his statement and to show him a photo of defendant so he could make a formal identification. Forberg showed Patino a single photo of defendant, not a photo lineup, "[b]ecause of his knowledge" of defendant. Patino identified defendant as the shooter. Forberg then attempted to conduct an interview with Gonzalez, but they were unable to complete the interview because Gonzalez was "quite upset and distraught" over Ulises dying. At approximately 4:30 a.m. that day, Forberg went to the address where the recovered vehicle was registered, 1449 South State Street in Calumet City, Illinois. There, Detectives Forberg, Eberle, and Deneen placed defendant into custody. Forberg also briefly spoke with defendant's mother. At approximately 10 a.m., Forberg went to the auto pound to test drive the vehicle based on statements from Monok at the time of defendant's arrest. Forberg drove the vehicle and found it was operable. In addition, counsel asked Forberg:

> "STATE: Did you have any information that the vehicle had been repaired since being brought to the pound [*sic*] from the location of 104th [and] Oglesby until the time you drove it?
>
> WITNESS: It had been repaired, no."

Forberg then went with Eberle and Deneen to Tellez's residence, based on a 9-1-1 call she had made, arriving at about 11:30 a.m. Subsequently, at approximately 12:40 a.m. on August 12, 2009, Gonzalez viewed a lineup and identified defendant as the man who shot her friends. During the course of the investigation, Forberg learned the weapon used in the shooting had been recovered from a man named Casey Hester. Forberg conducted an investigation to determine whether there was any connection between defendant and Casey Hester, but he could find no connection. Forberg explained that he did not request a gunshot residue test be performed on defendant because eight or nine hours had passed between the shooting and when defendant was arrested, and "the amount of time had elapsed for a suitable and proper test."

¶ 18    On cross-examination, Forberg testified that he never received solid information about the identity of the other men in the car at the time of the shooting. Patino, Gonzalez, and Negrete

did not give Forberg even a single digit for the license plate number of the vehicle involved in the shooting. Forberg did not believe Gonzalez was only five or six feet away from the car at the time of the shooting. He also could not recall whether Tellez said anything about seeing a white male getting into a car at the time of the shooting, but that information was not in Forberg's report. He said he may have failed to document it but he did not recall. According to Forberg's report, Patino told Forberg that before shots were fired he told his friends to turn around and he was getting down by a tree when he looked over and observed gunshots. Forberg believed there were cars parked on the street when he arrived.

¶ 19    Officer Eric Szwed, a forensic investigator, testified that at approximately 10:30 p.m. on August 10, 2009, he was assigned to process the scene of a homicide at 10700 South Calhoun. Upon arriving, he spoke with Detectives Eberle and Forberg, and then did a walkthrough of the area. Szwed observed seven cartridge cases on the ground, indicating at least seven shots had been fired, and a red stain on the curb. Szwed took photographs of the scene and the evidence. Four of the cartridge cases were grouped together on the ground. Over an objection from defendant, Szwed testified that the grouping is consistent with an individual firing from a fixed position. Szwed then went to 10431 South Oglesby, the location of a vehicle that was suspected of being owned by the offender. The vehicle was a 1995 blue Oldsmobile Cutlass. Szwed photographed the vehicle, performed gunshot residue tests on the vehicle, and attempted to collect any possible DNA from the vehicle's interior. He also removed the "headliners"[1] from the driver's side front and rear of the vehicle. Szwed administered a gunshot residue test on the inside of the vehicle's four doors. He also attempted to collect fingerprints but the humidity interfered with that process. Szwed collected material for DNA testing in the vehicle. He did not find any weapons or cartridges inside the car.

¶ 20    Lisa Kell, a forensic scientist specializing in forensic biology and DNA analysis and an expert in the field of forensic DNA analysis, testified that she was assigned to the instant case and received a buccal standard from Sharon Monok, a buccal standard from defendant, two swabs from the steering wheel and gearshift, and two swabs from the interior driver's side door handle and armrest. Kell performed DNA analysis on the swabs and identified a "major human male DNA profile from which [defendant] cannot be excluded" on the swabs from the steering wheel and gearshift, and from the interior driver's side door handle and armrest. Monok could be excluded from the mixture of DNA profiles identified. As to the steering wheel and gearshift swabs, Kell testified that "[a]pproximately one in 170 trillion blacks, one in 320 trillion whites, or one in 170 trillion Hispanic unrelated individuals cannot be excluded from having contributed to the profile." As to the swabs from the interior door driver's side door handle and armrest, Kell testified that "[a]pproximately one in 21 trillion black, one in 20 trillion white, or one in 12 trillion Hispanic unrelated individuals cannot be excluded from having contributed to the major human DNA profile."

¶ 21    Robert Berk, a trace evidence analyst and qualified as an expert in the area of forensic chemistry, specifically in trace chemistry and gunshot residue, testified that a gunshot residue test can be performed on a suspect's hand, but said it was recommended that the test be performed within six hours. "The reason behind that is the gunshot residue is lost from the skin surface due to normal hand activity. *** The time frame that we have for sampling a living suspect is six hours." Berk would not recommend taking a sample from a suspect eight hours

---

[1]This is the word that was used at trial, without further definition or description.

after a shooting had occurred. Berk did not receive a gunshot residue test kit sample taken from defendant's hands. A gunshot residue test can also be performed on inanimate objects. Berk examined the "headliners" from the driver's side front and rear of the Oldsmobile Cutlass for gunshot residue; both were negative for gunshot residue. Berk also received swabs from gunshot residue test kits containing samples taken from the interior of all four doors of the car. All four tests were negative for gunshot residue. Berk explained that if a shooter had his arm extended out of the driver's side window of the vehicle, the "cloud of smoke would have to be drawn back into the vehicle and deposited on the areas in which the collecting officers had collected from. If it does not come back in the car, I would not expect to find it on the sample stubs." If a shooter was standing outside of the vehicle when he fired his gun, it would be "a secondary transfer where the inside of the car isn't even exposed to the direct exposure to gunshot residue. It would have to be transmitted from that individual on his hands or on his clothing and then deposited on the areas which the car was sampled."

¶ 22 Officer Anthony Cereceres testified that at approximately 10:38 p.m. on April 12, 2010, he arrested a man named Casey Hester and recovered a semiautomatic handgun, "caliber 7.65." Cereceres arrested Hester at 8030 South Damen Avenue, about 90 blocks away from 107th and Calhoun.

¶ 23 The parties stipulated that, if called, Marc Pomerance, a forensic scientist, would testify that the seven cartridge cases found at the scene of the shooting were fired from the weapon recovered from Casey Hester.

¶ 24 Dr. Mitra Kalelkar, an expert in forensic pathology, testified that on August 11, 2009, she performed an autopsy on the body of Ulises. Based on her training, experience, and observations of the body, it was the opinion of Kalelkar, to a reasonable degree of forensic certainty, that Ulises died as the result of a single gunshot wound to the left side of his back, which caused massive internal bleeding. The manner of death was homicide.

¶ 25 The State then rested and the court denied defendant's motion for a directed finding.

¶ 26 Sharon Monok, defendant's mother, testified for the defense that in August 2009, she lived at 1449 South State and owned a 1995 Oldsmobile Cutless Sierra. Prior to August 10, 2009, the last time she had seen her car was the morning of August 9, 2009, before going to work. On August 10, 2009, she left for work at 4 p.m. The Oldsmobile was not at her home that day and before going to work, Monok spoke with defendant. As a result, she believed her car was near Trumbull Park and that it was not working, so she called a mechanic. Defendant was home when Monok left for work at 4 p.m. on August 10, 2009, and when she arrived home from work at 3 a.m. on August 11, 2009, defendant was asleep on the couch. At approximately 4:30 a.m. on August 11, 2009, police officers came to Monok's home and arrested defendant.

¶ 27 On cross-examination, Monok testified that she never went to Trumbull Park to verify whether her car was broken down and she had no personal knowledge as to whether the car was operable. Monok said she loves her son and was upset when he was arrested.

¶ 28 The jury found defendant guilty of the first degree murder of Ulises Patino, the attempted first degree murder of Israel Negrete, and aggravated battery with a firearm as to Israel Negrete. The jury also found that defendant personally discharged a firearm during the commission of the first degree murder and that he personally discharged a firearm during the commission of the attempt murder. Defendant's motion for new trial was denied.

¶ 29    The court sentenced defendant to 45 years in prison for each of the first degree murder convictions, to be served concurrently. Defendant also received sentences of 31 years for the attempted first degree murder charge and 30 years for the aggravated battery charge, to run concurrent with each other and consecutive to the first degree murder sentences.

¶ 30    On appeal, defendant first contends that the court erred by allowing testimony about prior consistent statements of Patino, Gonzalez, and Tellez from the witnesses themselves and from the investigating officers. Specifically, defendant takes issue with the following testimony. At trial, Patino testified that he recognized the shooter as Michael Temple, the defendant, that he told the police Michael Temple was the shooter, that defendant went by the nicknames White Boy Slim and Snowflake, and that the car was a four-door Oldsmobile Cutlass. Patino then testified that during his call to 9-1-1, he described the car as a four-door, light blue Oldsmobile Cutlass. Officer Olugabala testified that she was present during an on-scene interview when Patino told the police the shooter's name and nickname and gave a description of the vehicle. Detective Forberg testified that Patino named defendant during the interview at the scene of the shooting and later testified that Patino had already identified defendant by name before the photo identification. Gonzalez testified the shooter was a white man and that the vehicle was an older model with four doors and a "grayish, bluish, midnight blue color." Olugabala later testified that Gonzalez described the shooter and the vehicle involved in the shooting, as well as the direction the vehicle traveled after the shooting. Tellez testified that, after hearing gunshots being fired, she looked outside and saw a white man getting into a car and driving away. She also testified that she told a detective that she saw a white male when she looked out her window and that she saw a car pull away, and that when three detectives came to her home on another occasion she told them she saw a white male when she looked out her window.

¶ 31    As an initial matter, the State contends defendant has forfeited this issue on appeal because he failed to object to the use of the prior consistent statements during trial or raise the issue in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (a defendant forfeits review of an issue if he fails to object at trial and raise the issue in a posttrial motion). The State further argues that all of the statements were statements of identification and were properly admitted by the trial court. Defendant responds that the issue may be properly reviewed as plain error.

¶ 32    The plain error doctrine is a narrow, limited exception to the general forfeiture rule. *People v. Walker*, 232 Ill. 2d 113, 124 (2009). Under the doctrine, a reviewing court may consider a forfeited issue if a clear and obvious error occurred and either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error is so serious that it affected the fairness of the defendant's trial and undermined the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Under either prong, the defendant has the burden of persuasion and, if he fails to satisfy his burden, " 'procedural default must be honored.' " *Walker*, 232 Ill. 2d at 124 (quoting *People v. Keene*, 169 Ill. 2d 1, 17 (1995)). First, we will consider if a clear and obvious error occurred because "without error, there can be no plain error." *People v. Smith*, 372 Ill. App. 3d 179, 181 (2007).

¶ 33    We will only reverse a trial court's decision whether to admit evidence if the trial court abused its discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). "An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful or unreasonable [citation] or where no reasonable person would agree with the position adopted by the trial court [citations]." *Id.*

¶ 34    Generally, a witness's prior consistent statements are inadmissible to corroborate the trial testimony of that witness because they serve to unfairly enhance the witness's credibility.

*People v. Johnson*, 2012 IL App (1st) 091730, ¶ 60. However, this rule does not apply to statements of identification. *People v. Shum*, 117 Ill. 2d 317, 342 (1987); *People v. Tisdel*, 201 Ill. 2d 210, 217 (2002) (citing *People v. Hayes*, 139 Ill. 2d 89, 138 (1990)). Section 115-12 of the Code of Criminal Procedure of 1963 (the Code), titled "Substantive Admissibility of Prior Identification," provides:

> "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2008).

¶ 35　　We find guidance as to the application of section 115-12 from *Shum*, *Tisdel* and *People v. Newbill*, 374 Ill. App. 3d 847, 853 (2007). In *Shum*, the defendant was charged with, and ultimately convicted of, several violent crimes, including the murder of Gwendolyn Whipple and the attempted murder of Theresa Conway. *Shum*, 117 Ill. 2d at 332. At trial, Conway "identified the man who entered the apartment that evening–the man she knew only as Keith–as the defendant, Keith Shum." *Id*. at 333. On appeal, the defendant challenged Conway's testimony that "Keith" had shot her and Whipple as improper hearsay. *Id*. at 341-42. In response, our supreme court explicitly recognized that "the general rule that witnesses may not testify as to statements made out of court to corroborate their testimony given at trial does not apply to statements of identification." *Id*. at 342. The court concluded that the victim's testimony about her identification of her attacker as "Keith," therefore, did not fall within the hearsay rule. *Id*.

¶ 36　　In *Tisdel*, the supreme court expanded on this exception to the hearsay rule. There, the defendant was convicted of first degree murder based on a drive-by shooting that occurred in September 1995. *Tisdel*, 201 Ill. 2d at 211. The victim was shot by the passenger of a black IROC Chevrolet Camaro as it drove by. *Id*. at 212. The driver of the Camaro was identified and arrested shortly after the shooting, but the defendant was not identified until almost one year later, in lineups conducted in August 1996 and September 1997. *Id*. On appeal, the defendant argued that "he was deprived of a fair trial when the State's witnesses testified that they had viewed lineups containing persons other than defendant and had made no identification." *Id.* at 215. He claimed the State was using the testimony to bolster its case and, as he had not objected to the testimony at trial or included the issue in a posttrial motion, the defendant asked the court to review the issue as plain error. *Id*. at 215-16. The appellate court held that the testimony should not have been allowed because "it was presented simply to corroborate the witnesses' subsequent identification of defendant." *Id*. at 216.

¶ 37　　The supreme court granted the State's petition for leave to appeal. *Id*. The court first noted that in a prior supreme court opinion, *People v. Hayes*, 139 Ill. 2d 89 (1990), it had found that the admission of witness testimony that the witnesses had viewed pictures of persons other than the defendant and had not made an identification were admitted in error. *Tisdel*, 201 Ill. 2d at 216 (citing *Hayes*, 139 Ill. 2d at 138). The *Tisdel* court explained that the *Hayes* court had held such statements were not statements of identification and therefore not subject to the identification exception to the hearsay rule. *Tisdel*, 201 Ill. 2d at 217 (citing *Hayes*, 139 Ill. 2d at 138). However, the *Tisdel* court concluded:

> "[T]he *Hayes* court erred in limiting 'statements of identification' to a witness' actual identification of a defendant. This interpretation mistakenly focuses on the result rather than the process. As a consequence, a trier of fact may be deprived of information

necessary to an informed decision concerning a witness' reliability. In contrast, construing 'statements of identification' to include the entire identification process would ensure that a trier of fact is fully informed concerning the reliability of a witness' identification, as well as the suggestiveness or lack thereof in that identification." *Tisdel*, 201 Ill. 2d at 219.

The supreme court ultimately reversed the judgment of the appellate court and affirmed the judgment of the circuit court. *Id*. at 221.

¶ 38　　　In *Newbill*, the defendant was convicted of the offense of robbery. *Newbill*, 374 Ill. App. 3d at 848. At trial, the police officer who initially interviewed the victim testified that the victim gave a description of the offender to the officer, that the offender was " 'a black male, 5'7" to 5'8", medium build. He had a goatee and a mustache, possibly with some gray in the mustache. Had a dark-colored baseball cap on, a red hoody [*sic*] sweatshirt with a black knee-length leather coat on and jeans.' " *Id*. at 850. On appeal, the defendant argued that the officer's testimony concerning the victim's description of him was inadmissible hearsay. *Id*. at 850-51. In response, the State claimed that the testimony fell under the hearsay exception for statements of identification pursuant to section 115-12. *Id*. at 851.

¶ 39　　　In its analysis, the Fourth District discussed several cases which involved statements of identification, including *People v. Rogers*, 81 Ill. 2d 571 (1980), and *Tisdel*. The *Newbill* court recognized that section 115-12 was "born out of" the supreme court's decision in *Rogers*. *Newbill*, 374 Ill. App. 3d at 851-52 (citing *People v. Lewis*, 165 Ill. 2d 305, 342-43 (1995) ("noting section 115-12 of the Code was born out of the *Rogers* decision")). The *Newbill* court then explained:

　　　"In *Rogers*, a detective testified that the witness described the robber's age, height, weight, and hair color, and said that the robber wore glasses and had a mustache. [Citation.] The detective testified he made a composite sketch based on that description. [Citation.] The *Rogers* court noted that 'the composite and *testimony concerning the production thereof* constituted extrajudicial statements of identification.' (Emphasis added.) [Citation.] The *Rogers* court found, however, that the trial court did not err by admitting into evidence the composite sketch where the witness testified under oath and was subject to cross-examination, and the evidence was admitted as prior identification evidence to corroborate the prosecuting witness's in-court identification of the defendant. [Citation.] The court held 'the trial court correctly admitted the composite sketch and [the witness's] description in evidence as corroboration of his in-court identification of the defendant.' [Citation.] Thus, it appears that prior to the legislature's enactment of section 115-12 of the Code, the supreme court considered an extrajudicial physical description–such as height and hair color–as 'identification evidence.' " *Newbill*, 374 Ill. App. 3d at 852.

¶ 40　　　The *Newbill* court went on to discuss the supreme court's holding in *Tisdel* that statements of identification should " 'include the *entire identification process*' " (Emphasis in original.) *Newbill*, 374 Ill. App. 3d at 852 (quoting *Tisdel*, 201 Ill. 2d at 219). The *Newbill* court concluded that the officer's testimony as to the victim's description of the defendant was the first step in the " 'entire identification process' " and found the statements were properly admitted under section 115-12. *Newbill*, 374 Ill. App. 3d at 853.

¶ 41　　　Here, we similarly conclude that the statements defendant challenges as improper hearsay were properly admitted as statements of identification under section 115-12. Patino, Gonzalez,

- 11 -

and Tellez all testified at trial and were subject to cross-examination. Following *Shum*, *Tisdel*, and *Newbill*, we find that the witnesses' statements regarding defendant's description are statements about steps in the identification process and, accordingly, are statements of identification. Moreover, we conclude the descriptions of the car are similarly statements about the entire identification process and were also properly admitted as statements of identification. See *People v. Williams*, 263 Ill. App. 3d 1098, 1111 (1994) (finding that a police officer's testimony as to the one complainant's description of the offender, the offender's clothing, and the type and color of his car were statements that were properly admitted pursuant to section 115-12).

¶ 42     In addition, the testimony from the police officers and detectives regarding the prior consistent statements of identification made by Patino, Gonzalez, and Tellez also fall under the purview of section 115-12. See *Shum*, 117 Ill. 2d at 342 (holding that where a witness testifies he previously identified an offender and that witness has been cross-examined, a third party may testify that he heard or saw that witness identify the offender). According to the supreme court:

> "The plain language of section 115-12 requires the declarant to testify and be subject to cross-examination on the identification statement. [Citation.] There are no other requirements for admission of a third party's testimony about the declarant's out-of-court identification [statement]." *People v. Lewis*, 223 Ill. 2d 393, 402-03 (2006).

Because the witness's statements were properly admitted under section 115-12, the police officers' testimony about the same statements was also properly admitted.

¶ 43     Defendant relies on *People v. Smith*, 139 Ill. App. 3d 21 (1985), to support his argument that these statements were admitted in error, but we find *Smith* to be distinguishable. In *Smith*, the defendant was convicted of murder after the State's principal witness, Leon Moore, testified that he saw defendant kill the victim. *Smith*, 139 Ill. App. 3d at 23-24. On appeal, the defendant claimed that the court improperly admitted an out-of-court statement made by Moore in order to bolster Moore's credibility. *Id.* at 31. After Moore testified, the State called Royal Johnson to the stand and, on rebuttal, Johnson testified that Moore told him the defendant shot the victim. *Id.* The *Smith* court ultimately concluded that the statement was improperly admitted because Moore was crucial to the State's case as the only eyewitness to the shooting, Moore's credibility was shaken because he was an admitted drug dealer who waited nine months to come forward with his information, the statement was important in making Moore's testimony more believable, and the jury's reliance on Moore's out-of-court statement was made more likely by the prosecutor referring to it in closing argument. *Id.* at 34. However, the statement in *Smith* was not a statement of identification: it was testimony from a third party, who was not present during the shooting or part of the investigation afterwards. Johnson, who had no personal knowledge of and who was not a witness to the shooting, testified about a statement Moore made to him three weeks after the shooting. Unlike in the present case, Moore's statement to Johnson was not a statement relating to the process of identification. It was a hearsay statement introduced solely for the purpose of bolstering Moore's testimony. Therefore, we find *Smith* to be inapposite.

¶ 44     Defendant also complains about the State referring to these prior consistent statements of identification in closing and rebuttal arguments. However, because these statements were not improper, the State could properly comment on them in closing and rebuttal. See *People v.*

*Nicholas*, 218 Ill. 2d 104, 121-22 (2005) (noting that in closing argument a prosecutor is free to comment on the evidence and any reasonable inferences based on the evidence).

¶ 45    In his reply brief, defendant argues that the statements were improperly admitted pursuant to the plain language of Illinois Rule of Evidence 801(d)(1)(B) (eff. Jan. 1, 2011). In a motion to cite additional authority, which we granted, the State notes that the language of Rule 801(d)(1)(B) is almost identical to that of section 115-12 and that, under either, the statements were properly admitted as statements of identification. We agree with the State.

¶ 46    Rule 801(d)(1)(B) provides that a statement is not hearsay if, "[i]n a criminal case, the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is *** one of identification of a person made after perceiving the person." Ill. R. Evid. 801(d)(1)(B) (eff. Jan. 1, 2011). We note that this language is essentially identical to that of section 115-12, which provides that "[a] statement is not rendered inadmissible by the hearsay rule if *** the declarant testifies at the trial or hearing, and *** the declarant is subject to cross-examination concerning the statement, and *** the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2008). The Illinois Rules of Evidence became effective on January 1, 2011. According to the committee commentary on the rules of evidence, the purpose of creating the rules was to codify existing Illinois law into one "easily accessible, authoritative source." Illinois Rules of Evidence, Committee Commentary. In addition, the committee specifically provides that "[i]t is important to note that the Illinois Rules of Evidence are not intended to abrogate or supersede any current statutory rules of evidence." *Id*. The committee also states in the comments that Rule 801(d)(1)(B) is a codification of section 115-12 of the Code. The plain language of the committee comments shows that the rules of evidence are meant to codify existing law, not abrogate it, and section 115-12 has been interpreted to allow not only statements of identification of a person as substantive evidence, but also descriptions of the offender, his clothing, and his vehicle, as discussed above. See *Williams*, 263 Ill. App. 3d at 1111 (finding that a police officer's testimony as to the one complainant's description of the offender, the offender's clothing, and the type and color of his car were statements that were properly admitted pursuant to section 115-12); see also *Tisdel*, 201 Ill. 2d at 219 (holding that statements of identification include the "entire identification process"); *Newbill*, 374 Ill. App. 3d at 851 (agreeing with the holding in *Williams* and finding that descriptions of the offender are admissible as statements of identification pursuant to section 115-12). Moreover, as we also discussed previously, section 115-12 codified the supreme court's decision in *Rogers*, where the court found that testimony about the suspect's description and the production of a composite sketch of the suspect were properly admitted as statements of identification. *Newbill*, 374 Ill. App. 3d at 851-52; *Lewis*, 165 Ill. 2d at 342-43. Therefore, we find that the creation of Rule 801(d)(1)(B) did not negate existing case law with respect to section 115-12. Accordingly, and in light of our prior analysis, we conclude that the prior statements of identification were properly admitted under both section 115-12 and Rule 801(d)(1)(B).

¶ 47    To the extent that defendant has cited cases from other jurisdictions as persuasive authority, we note that " '[a]lthough it is helpful to look to other jurisdictions for guidance, we are not bound by those decisions and must decide the case in a manner consistent with Illinois law.' " *People v. Sito*, 2013 IL App (1st) 110707, ¶ 21 (quoting *Independent Trust Corp. v. Kansas Bankers Surety Co.*, 2011 IL App (1st) 093294, ¶ 24). Because we have concluded

there was no error in the introduction of the identification testimony, there can be no plain error.

¶ 48    Even assuming the trial court erred in admitting the testimony of the prior consistent statements of identification, it would still not rise to the level of plain error. First, the evidence at trial was not closely balanced. Patino testified that he had the opportunity to view the shooter and identified the shooter as defendant, whom Patino knew from around the neighborhood. Patino later identified a photo of defendant, again saying defendant was the shooter, and also identified defendant as the shooter in open court. Gonzalez also testified that she had the opportunity to view the shooter for a "little more than half a minute." She had seen defendant around the neighborhood previously and identified defendant in a lineup as the person she saw shooting at her and her friends. Both Patino and Gonzalez testified that defendant was wearing a white, short-sleeved shirt the night of the shooting. In addition, Patino, Gonzalez, and Negrete all testified to similar descriptions of the car used in the shooting. Patino testified that the car was a four-door, light blue, Oldsmobile Cutlass. Gonzalez testified that the car was a four-door, "older model" car that was a "grayish, bluish, midnight blue color." Negrete testified that the car was a four-door, bluish-gray vehicle. The police located a car that matched the provided descriptions the night of the shooting, near the area where the shooting occurred. That same night, Patino and Gonzalez viewed the vehicle and identified it as the vehicle that had been involved in the shooting. The testimony of Patino, Gonzalez, and Negrete was corroborated by Tellez, who testified that she heard shots, and then saw a white man get into the driver's side of a "light-colored vehicle" at the same intersection where the shooting occurred. We acknowledge that Patino, Gonzalez, and Negrete did not testify to seeing defendant outside of the vehicle. However, Tellez's testimony is not inconsistent with that of Patino, Gonzalez, and Negrete because the three eyewitnesses each testified to not observing the shooter at all times during the shooting: Patino testified he did not look at defendant after the first shot, Gonzalez heard additional shots after turning away from the vehicle, and Negrete testified that although he saw sparks coming from the car, he ran away as soon as he heard shots and did not pay attention to who was shooting. Finally, the recovered vehicle was registered to defendant's mother, and defendant's DNA was found on the steering wheel, gearshift, and driver's side door and armrest of the recovered vehicle.

¶ 49    Defendant claims that the inconsistencies in the testimony, including inconsistencies about the distances, how fast the car was going during the shooting, and the number of shots fired, were enough to undermine the evidence against him. However, "[t]he weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). Furthermore, although the witnesses were inconsistent in the details, Patino and Gonzalez consistently and positively identified defendant as the shooter and they also consistently and positively identified the vehicle used in the shooting. Under these circumstances, we find the evidence against defendant was overwhelming and therefore defendant has not met the first prong of the plain error doctrine.

¶ 50    As to the second prong of the plain error doctrine, defendant has not sufficiently argued under the second prong for any of his alleged errors. When a defendant fails to make a plain error argument, that defendant " 'obviously cannot meet his burden of persuasion' " that the plain error doctrine has been satisfied, and therefore procedural default is honored. *People v.*

- 14 -

*Leach*, 2012 IL 111534, ¶ 61 (quoting *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010)). Here, defendant only argued that "authority clearly shows that the Illinois Supreme Court has in no respect abandoned the second prong of plain error analysis for instances of evidentiary error or prosecutorial misconduct in closing argument." However, the cases on which defendant relies do not support his argument. See *People v. Rivera*, 2013 IL 112467; *People v. Adams*, 2012 IL 111168; *People v. White*, 2011 IL 109689. In *Rivera*, the supreme court considered only whether a clear and obvious error had occurred with regard to whether certain statements made by the defendant were properly admitted into evidence and ultimately concluded that no clear and obvious error occurred. *Rivera*, 2013 IL 112467, ¶ 17. The court discussed the second prong of the plain error doctrine only in passing when discussing the procedural history. *Id.* ¶ 12. In *Adams*, the supreme court considered whether the prosecutor's comments in closing in rebuttal argument amounted to plain error. *Adams*, 2012 IL 111168, ¶ 21. The court found that the statements did not amount to plain error but, with respect to the second prong, said only that to meet the second prong, the error must "be 'so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process.' [Citation.] The error here does not rise to that level." *Id.* ¶ 24 (quoting *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). Finally, in *White*, the supreme court only considered the first prong of the plain error doctrine. *White*, 2011 IL 109689, ¶ 131. Defendant has made no additional argument, reasoning, or citation as to why any of the alleged errors he challenges under the plain error doctrine would succeed under the second prong. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (the argument section of appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and pages of the record relied on").

¶ 51     Moreover, our supreme court has equated the second prong of plain error review with structural error. *People v. Thompson*, 238 Ill. 2d 598, 613-14 (citing *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009)). Structural error is a "systematic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " *Glasper*, 234 Ill. 2d at 197-98 (quoting *People v. Herron*, 215 Ill. 2d 167, 186 (2005)). Our supreme court also recognized that the United States Supreme Court has recognized an error as structural in a very limited class of cases, including: a complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction. *Thompson*, 238 Ill. 2d at 609 (citing *Washington v. Recuenco*, 548 U.S. 212, 218 n.2 (2006)). We conclude that the errors defendant has complained of here, admission of prior consistent statements, hearsay testimony from police officers going beyond the scope of explaining police procedure, and prosecutorial misconduct in closing and rebuttal arguments, do not fall under the umbrella of structural error, and decline to comment further on the second prong.

¶ 52     In the alternative, defendant argues his counsel was ineffective for failing to properly preserve the error with a contemporaneous objection and raising the issue in a posttrial motion, and for failing to request a limiting jury instruction.

¶ 53     To prevail on a claim of ineffective assistance of counsel, a defendant must show both that his counsel's performance was deficient and that he was prejudiced by counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is considered deficient where " 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " *People v. Cooper*, 2013 IL App (1st) 113030, ¶ 53 (quoting *Strickland*, 466 U.S. at 687). To show prejudice, a

defendant must show that but for counsel's actions there is a reasonable probability that the trial outcome would have been different. *Cooper*, 2013 IL App (1st) 113030, ¶ 53. If the defendant fails to show either prong of the *Strickland* test, his claim will fail. *People v. Manning*, 334 Ill. App. 3d 882, 892 (2002).

¶ 54    Here, defendant cannot show he received ineffective assistance of counsel. First, for the reasons discussed above, we have already concluded that the testimony about the prior consistent statements of identification were properly admitted. Defense counsel cannot be found ineffective for failing to object to evidence that was properly admitted. *People v. Rutledge*, 409 Ill. App. 3d 22, 26 (2011) (citing *People v. Jackson*, 391 Ill. App. 3d 11, 34 (2009)). In addition, the fact that defense counsel did not object to these statements does not, in our opinion, indicate any deficiency in his performance but, rather, demonstrates counsel's knowledge of well-established Illinois law that a witness who testifies at trial and is subject to cross-examination may testify to a statement of identification of the accused. 725 ILCS 5/115-12 (West 2008); *Tisdel*, 201 Ill. 2d at 217. Accordingly, defendant cannot meet the first prong of the *Strickland* test.

¶ 55    Moreover, even if we concluded the prior consistent statements of identification were admitted in error, defendant cannot show he was prejudiced by counsel's actions. As we have already discussed, the evidence presented against defendant at trial was overwhelming. Two eyewitnesses to the shooting, Patino and Gonzalez, positively identified defendant as the shooter. Patino and Gonzalez also identified the car that was used in the shooting the same night of the shooting. The police located the car near the area where the shooting occurred based on the description provided to them by Patino, Gonzalez, and Negrete. In addition, the vehicle was registered to defendant's mother, and defendant's DNA was found on the steering wheel, gearshift, driver's side interior door handle, and armrest. Even if defense counsel had objected to the identification testimony and asked for a limiting instruction, the trial outcome would not have been different. Therefore, defendant has failed to show he received ineffective assistance of counsel.

¶ 56    Defendant next contends that the trial court erred by improperly admitting repeated hearsay evidence from police officers, which exceeded the scope of any reasonable need to explain police procedure. Defendant specifically challenges four portions of trial testimony as improper.

¶ 57    In response, the State argues that defendant has forfeited this issue by failing to object to the challenged statements at trial or raise the issue in a posttrial motion. See *Enoch*, 122 Ill. 2d at 186. Defendant replies that he objected to one of the contested statements but that the issue may be reviewed under the first prong of the plain error doctrine. See *People v. Sanders*, 2012 IL App (1st) 102040, ¶ 24 (where the defendant objected to only some of the statements he was challenging on appeal, the issue was forfeited and could only be reviewed as plain error). As pointed out above, to establish plain error under the first prong of the doctrine, a defendant must show that a clear and obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant. *Piatkowski*, 225 Ill. 2d at 565. Once again, defendant has the burden of persuasion under either prong and procedural default will be honored if he fails to satisfy his burden. *Walker*, 232 Ill. 2d at 124.

¶ 58    Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is generally inadmissible at trial unless it falls within an exception to the rule. *People v. Caffey*, 205 Ill. 2d 52, 88 (2001); *People v. Olinger*, 176 Ill. 2d 326, 357 (1997). One such exception

exists where the statement is offered "for the limited purpose of showing the course of a police investigation where such testimony is necessary to fully explain the State's case to the trier of fact." *People v. Jura*, 352 Ill. App. 3d 1080, 1085 (2004) (citing *People v. Williams*, 181 Ill. 2d 297, 313 (1998)). We will only reverse a trial court's ruling on the admissibility of evidence where the trial court abused its discretion. *Becker*, 239 Ill. 2d at 234.

¶ 59    First, defendant contends that Olugabala's testimony that, after receiving information from Gonzalez and Patino, a flash message was put out for a white male named Michael Temple who had a nickname of White Mike was error. Although we agree with defendant that the naming of defendant in the flash message was not "necessary to fully explain" the course of the investigation, any error was harmless. "We consider his claim of error under the rubric of harmless error, aware that if an error was harmless, it most certainly cannot rise to the level of plain error." *People v. Leach*, 2012 IL 111534, ¶ 141. In deciding whether an error is harmless, a reviewing court may "determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *People v. Becker*, 239 Ill. 2d 215, 240 (2010). Here, prior to Olugabala testifying, Patino testified that defendant was the shooter and that he told the police defendant was the shooter. As we found above, Patino's testimony was properly admitted as a statement of identification and, therefore, Olugabala's improper testimony about the flash message simply duplicated properly admitted evidence. Accordingly, we find this error does not rise to the level of plain error. *Leach*, 2012 IL 111534, ¶ 141.

¶ 60    Defendant next challenges Colucci's testimony that, after responding to a call of shots fired, he received information including a description of the offender's vehicle and the name of a suspect wanted in connection with the shooting. Colucci also testified he obtained the "last whereabouts" of the suspect and, about 15 or 20 minutes after the shooting occurred, he proceeded to the general area of the suspect's last whereabouts. In that general area, at 104th and Oglesby, Colucci saw a vehicle matching the description of the offender's vehicle. We find this portion of testimony was properly admitted. Colucci's testimony concerning a description of the vehicle and the suspect's last known whereabouts was necessary to explain why Colucci immediately proceeded to the area around 104th and Oglesby and how Colucci was able to identify the vehicle as the one involved in the shooting. Moreover, Colucci did not give any specifics of the description or the suspect's name; he only testified to the extent necessary to explain his actions after receiving the information. Therefore, Colucci's testimony fell within the scope of the police procedure exception to the hearsay rule.

¶ 61    The third portion of testimony challenged by defendant as improper hearsay is Colucci's testimony that the recovered vehicle was registered to Sharon Monok at the same address where the suspect was last known to reside. Again, we agree with defendant that this testimony was not necessary to fully explain the course of the investigation, however we find that any error was harmless. As before, "[w]e consider his claim of error under the rubric of harmless error, aware that if an error was harmless, it most certainly cannot rise to the level of plain error." *Leach*, 2012 IL 111534, ¶ 141. After Colucci testified, the State introduced a certified copy of the records for the recovered vehicle, showing it belonged to Sharon Monok. Therefore, Colucci's testimony was cumulative and duplicative of properly admitted evidence and, at most, harmless error. See *Becker*, 239 Ill. 2d at 240 (a reviewing court may consider "whether the improperly admitted evidence is merely cumulative or duplicates properly

admitted evidence" in determining whether any error was harmless). Accordingly, we find this error does not rise to the level of plain error. *Leach*, 2012 IL 111534, ¶ 141.

¶ 62    Finally, we note that the fourth portion of testimony defendant challenges as improper hearsay is not hearsay at all. Defendant argues that Detective Forberg testified "he received information from the auto pound that the car had not been repaired since being impounded." The record shows that the challenged exchange went as follows:

> "STATE: Did you have any information that the vehicle had been repaired since being brought to the pound from the location of 104th [and] Oglesby until the time you drove it?
>
> FORBERG: It had been repaired, no."

Contrary to defendant's interpretation of this testimony, we read this to be Forberg testifying that he had not received information indicating the vehicle had been repaired. Therefore, this particular testimony referenced a lack of information received that was within Forberg's own personal knowledge and was not hearsay. *Caffey*, 205 Ill. 2d at 88.

¶ 63    Defendant also claims that the cumulative impact of the errors precluded a fair trial. However, even taken together, the two improperly admitted portions of testimony would still not rise to the level of plain error because the evidence at trial was not closely balanced. Both Patino and Gonzalez identified defendant as the shooter within a short amount of time after the shooting: Patino identified defendant by name as the shooter as soon as the police arrived and identified defendant in a photo as the shooter a few hours later. Gonzalez identified defendant in a lineup less than 30 hours after the shooting. Patino, Gonzalez, and Negrete all gave similar descriptions of the vehicle used in the shooting and, a few hours after the shooting, Gonzalez and Patino identified the vehicle used in the shooting. The vehicle was registered to defendant's mother. Defendant's DNA was found on the steering wheel, gearshift, driver's side door, and arm rest of the car. Finally, Tellez corroborated the other witness testimony, testifying that she heard shots, and then saw a white man get into the driver's side of a "light-colored vehicle" at the same intersection where the shooting occurred.

¶ 64    Defendant next claims that the State engaged in prosecutorial misconduct during closing and rebuttal arguments by "systematically distorting the burden of proof, attacking the presumption of innocence, and unfairly bolstering its own evidence." Defendant specifically challenges two groups of comments from the State and concludes that the cumulative impact of these errors denied him a fair trial.

¶ 65    Initially, the State contends, and defendant does not dispute, that this issue has been forfeited because defendant failed to raise any of the challenged comments in a posttrial motion. See *Enoch*, 122 Ill. 2d at 186 (a defendant forfeits review of an issue if he fails to object at trial and raise the issue in a posttrial motion). Defendant claims that the issue may nonetheless be reviewed as plain error.

¶ 66    Once again, the plain error doctrine allows a reviewing court to consider a forfeited issue if a clear and obvious error occurred and either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error is so serious that it affected the fairness of the defendant's trial and undermined the integrity of the judicial process. *Piatkowski*, 225 Ill. 2d at 565. Defendant has the burden of persuasion under either prong. *Walker*, 232 Ill. 2d at 124. We will first consider if a clear and obvious error occurred because "without error, there can be no plain error." *Smith*, 372 Ill. App. 3d at 181.

¶ 67    The State acknowledges an apparent conflict between two Illinois Supreme Court cases as to the proper standard of review, but argues that the abuse of discretion standard is proper citing *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Defendant suggests that a two stage review is used without any citation to authority: applying a *de novo* standard when considering the propriety of the prosecutor's arguments, and an abuse of discretion standard when considering whether a defendant's substantial rights were affected. The First District recognized the standard of review conflict in *People v. Hayes*, 409 Ill. App. 3d 612 (2011), explaining that the supreme court in *People v. Wheeler*, 226 Ill. 2d 92 (2007), used a *de novo* standard while in *People v. Blue*, 189 Ill. 2d 99 (2000), and other cases, the court used an abuse of discretion standard. *Hayes*, 409 Ill. App. 3d at 624. Based on the supreme court's more recent pronouncement in *Wheeler*, we will review the issue *de novo*.

¶ 68    The State has wide latitude to comment on and draw reasonable inferences from the evidence in closing argument, even if those inferences are unfavorable to the defendant. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009); *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Comments made during closing arguments must be viewed in the context of the entire arguments by both parties and comments made during rebuttal argument are not improper if they were invited by the defense. *People v. Giraud*, 2011 IL App (1st) 091261, ¶ 43, *aff'd*, 2012 IL 113116. A reviewing court will not reverse a jury's verdict based on improper closing arguments unless the comments were of such magnitude that they resulted in substantial prejudice to the defendant and constituted a material factor in his conviction. *People v. Gonzalez*, 388 Ill. App. 3d 566, 587 (2008).

¶ 69    The first series of comments which defendant challenges are all related to the State's references to a conspiracy in its rebuttal argument. The State began its closing argument by reviewing the evidence generally, then went through each crime it sought to prove defendant guilty of, explained the propositions it needed to prove in order to support each charge, and discussed how the evidence presented at trial supported each element. In defendant's closing, defense counsel first went through the physical evidence and argued that it failed to show defendant was involved in the crimes with which he was charged. Defense counsel then turned to the witness testimony, first focusing on Tellez's testimony that she saw a white male getting into a light-colored car:

"She didn't say that. You know how we know she didn't say it because when Detective Forberg prepared his police reports as he said, and reviewed them.

The only thing that was that she saw a car so if, in fact, she is mistaken, and I'm not in any way arguing to you today that anybody who came on that witness stand is lying, but if, in fact, she's mistaken and only saw a car, which she described as a light car.

That's all she described it as. Then her testimony, if that's what she told the three experienced homicide detectives don't prove a darn thing. They don't prove anything."

Counsel also argued the testimony of Negrete, Gonzalez, and Patino did not support a finding of guilty, saying in part:

"Israel Negrete gives you nothing, and I mean nothing that would convict [defendant] of these crimes so we're down to the two Alejandra Gonzalez and Jesus Patino.

I'm going to take Alejandra first. Alejandra Gonzalez says to you and believe me she is not up their [*sic*] lying. She says that when the gunshots occur [they] are three to five feet away from the shooter."

Counsel then emphasized the difference in the distances Gonzalez and Patino testified to; Gonzalez testified that Patino was eight or nine feet away from her and she was only three to five feet away from the shooter, while Patino testified that he identified defendant from 40 to 45 feet away. Then, in reference to Gonzalez's description of the vehicle used in the shooting, counsel argued:

"[Gonzalez] said, she sees a guy she doesn't recognize in a midnight blue car, and I showed her a picture of the car, and I said to her, Ms. Gonzalez, when you said midnight blue, would it be darker than this car? Yes, yes, but I didn't mean that it would be.

Is midnight blue dark blue? Yes, yes, it is, but she told, you ladies and gentlemen, that it was a midnight blue car. This is a murder trial. The State has to prove beyond a reasonable doubt that [defendant] was guilty of this crime, and the [*sic*] one of the two identification witnesses, Alejandra Gonzalez, says that the shooter was within a car that was midnight blue.

Get out of here. Look at the car. It's not midnight blue. It's not any where close to even being blue. I would argue that it was gray.

\* \* \*

How many times have you seen [defendant] in your life, two or three times around the neighborhood.

Well, it's America not Russia. It's America. It isn't Albanio [*sic*], two or three times around the neighborhood and she can identify [defendant] riding in a midnight blue car. Give me a break."

Counsel then spent some time focusing on the discrepancy between Patino's and Gonzalez's testimony about whether defendant had any facial hair the night of the shooting:

"Here's the lineup photo. He put it up on the stand, and Alejandra Gonzalez comes down and said, would you, please, show the ladies and gentlemen of the jury, where you say that the defendant had facial hair?

She goes up to this and she starts pointing, will you find facial hair in here, and I've got a bridge to sell you in Brooklyn because there's is [*sic*] no facial hair on him, and he didn't have a beard, and when he was arrested was clean shaven."

He then went home and he shaved his beard off, but let's talk about Jesus Patino. When was the last time, and when was the last time that Jesus Patino saw [defendant], three or four years before, three or four years before.

\*\*\*

He didn't see him in the neighborhood for three or four years, and if you used your common sense, and I ask you to, if that car was moving, and then stopped, and then continued to move, and the shots were fired out of that car, how long of a chance after three or four years did Jesus Patino have to view the person that he identified as [defendant]?"

Finally, defense counsel also briefly referred to defendant's mother's testimony:

"And his mother testifies that she understood the car being at Trumbull Park and not in working order. Are you going to believe that this master criminal did all of this and just stayed there and allowed himself to be arrested by detectives \*\*\* eight or nine hours later?"

¶ 70    In response, the State began by arguing, in pertinent part:

"If I hear counsel's argument, there was some big conspiracy that was put together in the murder, attempt murder, and [defendant] just sits here today.

He wants you to believe that in the way that he just argued to you that somehow in those few minutes between when the shooting occurred, and when the police arrived Jesus Patino and Alejandra Gonzalez Israel Negrete all got together and said. Okay.

You say it was the Caucasian. You say you don't know who did it, and I'll say it's [defendant], and in that conspiracy, we're going to involve the Chicago Police Department.

And we're going to involve them to say go look for the car. It's on a 104th and Oglesby. The car that he drives, and his DNA is going to be all over it, and then they [*sic*] down the block and found Maria Tellez and said, all you have to say is that you saw a white guy get into a car.

That is what counsel's argument is having you believe that it's, oh poor [defendant]. He's the victim because there is a big conspiracy presented to you by all these witnesses.

Maria Tellez doesn't know who Jesus Patino is, [defendant], Israel Negrete, Alejandra Gonzalez, no connection. Somehow she's involved in a conspiracy. The Chicago Police department, whose jobs are to do these investigations jump right on board with Jesus and Alejandra to pin this case on [defendant]."

The State continued to discuss the evidence, mentioning evidence in light of the conspiracy argument a few more times:

"Once again what [*sic*] the physical evidence is not conspiring against [defendant] along with Jesus and Alejandra. That's ridiculous. Now, counsel wants to sit here and say these experienced detectives didn't have in their notes that Maria Tellez tell [*sic*] them that she saw a white male get into the car.

* * *

[The crime scene] was protected, red and yellow so counsel wants to somehow not have you imagine that there were cars there that somehow snook [*sic*] out behind the police's back. Absolutely not.

Those photographs were taken within minutes of it happening, no cars there, no obstructions so what the forensic investigators is now a part of this big conspiracy he made sure all the cars were gone before he took those photos.

That's ridiculous. What's even more ridiculous is the fact to say somehow Jesus, Alejandra, and Israel had put this whole early conspiracy together within the few minutes of this incident while Jesus' brother was dying from a gunshot wound while Israel was suffering from multiple gunshot wounds that resulted in him being hospitalized twice."

The State also commented in regard to Tellez's testimony that "for this to be some conspiracy that takes a lot of energy to make sure that all of these people say things not too much, but just enough to corroborate you."

¶ 71    Defendant argues that the State's multiple references to defense counsel "manufacturing a conspiracy" in rebuttal argument improperly shifted the burden of proof to defendant by suggesting, "defendant must be convicted unless the State's witnesses are incredible." First,

- 21 -

we note that the State is free to "comment upon defense characterizations of the evidence or case." *People v. Evans*, 209 Ill. 2d 194, 225 (2004). In addition, the supreme court has drawn "a distinction between situations where a prosecutor permissibly argues that a jury would have to believe the State's witnesses were lying in order *to believe* the defendant's version of events and where a prosecutor improperly argues that a jury would have to believe the State's witnesses were lying in order to *acquit* defendant." (Emphases in original.) *People v. Banks*, 237 Ill. 2d 154, 184-85 (2010) (citing *People v. Coleman*, 158 Ill. 2d 319, 346 (1994)).

¶ 72    Here, in its closing argument, the State began by listing the elements of each crime defendant was charged with before arguing how the evidence presented specifically supported each element. In introducing the elements of each crime, the State specifically stated: "the State must prove the following propositions" to sustain a charge for each crime: first degree murder, that defendant personally discharged a firearm during the commission of first degree murder, attempted first degree murder, that defendant personally discharged a firearm during the commission of an attempt first degree murder, and aggravated battery with a firearm. Then, although defense counsel was careful to clarify that he was not outright suggesting that the State's witnesses were lying, he nonetheless argued, in detail, numerous reasons why their testimony was not credible. Defense counsel argued that Tellez was mistaken when she said she saw a white male get into a car, that Negrete essentially saw nothing and that his testimony contradicted that of Patino and Gonzalez, that Patino's and Gonzalez's testimony was not credible due to inconsistencies between their testimony, and that the physical evidence did not corroborate the witness testimony. In rebuttal, the State argued that the defense was arguing there was a conspiracy theory, and then once again discussed how the witness testimony and physical evidence supported the charges. Based on the record before us, we conclude that the State's conspiracy argument in rebuttal was a proper response invited by defense counsel's characterization of the evidence in closing. Never in closing or rebuttal argument did the State suggest that defendant had to prove anything and the State only argued its conspiracy argument after defense counsel argued that all the State's witnesses were not credible or mistaken in their testimony and the physical evidence did not corroborate the witness testimony. Therefore, we find the State's comments were permissible arguments that the jury would have to believe the State's witnesses were lying in order to believe defense counsel's version of events.

¶ 73    We find the case on which defendant relies to be inapplicable. See *People v. Wilson*, 199 Ill. App. 3d 792 (1990). First, we note that *Wilson* was decided before the supreme court's decisions in *Banks* and *Coleman*, where the supreme court distinguished situations where a prosecutor argues that a jury would have to believe the State's witnesses were lying in order to believe the defendant's version of events versus arguing that the jury would have to believe the State's witnesses were lying in order to acquit defendant. *Banks*, 237 Ill. 2d at 184-85 (citing *Coleman*, 158 Ill. 2d at 346). In *Wilson*, the defendant argued that the State had improperly shifted the burden during closing by asking the jurors whether it was " 'curious to anyone the defense would have you believe everybody in this case is guilty except the Defendant.' " *Wilson*, 199 Ill. App. 3d at 796. The reviewing court found that the comments sent a message to the jury that the defendant had a burden to show the State's witnesses had lied in order to prove his innocence, improperly shifting the burden. *Id*. at 797. The court reasoned that "[t]o inform a jury that to believe the defense witnesses the jury must find that each of the State's witnesses was lying is a misstatement of law." *Id*. at 796.

¶ 74        Here, in contrast, the State's comments about a conspiracy were a direct response to the defense's attack on the credibility of the State witnesses and therefore "was not a misstatement of the law or an attempt to distort the burden of proof." *Banks*, 237 Ill. 2d at 185; see also *People v. Lash*, 252 Ill. App. 3d 239, 253 (1993) (stating that "[c]learly, whether defendant's theory of defense is reasonable in light of the evidence produced is within the scope of proper rebuttal comment").

¶ 75        Defendant also takes issue with the State's comments about disregarding the testimony of defendant's mother, arguing that defense counsel wanted the jury "to believe that our great city of Chicago auto pound decided to use this Cutlass Sierra, a 1995 model and fix it just because. That's ridiculous." However, the context of the entire closing argument from both parties makes clear that this was a proper and invited response to defense counsel's comment that defendant's mother believed the car to be in Trumbull Park and not in working order. Further, the State's response is a reasonable inference based on the testimony of Forberg, who went to the impound lot and drove the car, finding it to be operable, and received no information that the car had been repaired while at the impound lot.

¶ 76        The second set of comments that defendant challenges is the State's "misstatement and exaggeration" of facts to the jury, specifically in reference to comments on Officer Szwed's testimony. In closing argument, the State argued:

> "The forensic analyst comes to the crime scene, and he sees seven expended shell casings. There is a grouping, one, two, three, four which is consistent with a person being stationery, consistent with Maria Tellez seeing him outside of the car boom, boom, boom, boom, boom, shooting those additional shots."

Defendant's objection to this portion of argument was overruled and the court instructed the jury that any argument that did not comport with the evidence presented or reasonable inferences drawn from that evidence should be disregarded. In rebuttal argument, the State then argued:

> "What does Maria Tellez tell you. She saw someone getting in from the corner of a [*sic*] 107th and Calhoun. What does the physical evidence tell you, there's four casings grouped together in a fixed position.
>
> The forensic investigator told you consistent when a person is stationery shooting in the direction as Jesus and Alejandra told you, the direction of them, four grouped together."

¶ 77        Again, the State has wide latitude to comment on and draw reasonable inferences from the evidence during closing argument. *Glasper*, 234 Ill. 2d at 204. However, it is improper for the prosecutor to argue assumptions of facts not based upon the evidence or to present the jury with what amounts to his own testimony. *People v. Maldonado*, 398 Ill. App. 3d 401, 420 (2010).

¶ 78        In the present case, the prosecutor's review of the evidence was accurate. Tellez testified that she heard seven gunshots, went to her back door to see where the shots came from, and saw a white male getting into the driver's side of a light-colored vehicle. Officer Szwed, a forensic investigator, testified that at the scene of the shooting he observed seven expended cartridge cases on the street. He also testified that there was a grouping of four cartridge cases near the curb, which was consistent with an individual firing a weapon from a fixed position. The State's comments in closing and rebuttal that a grouping of four shell casings is consistent

with someone shooting from a stationary position and therefore consistent with Tellez's testimony that she saw a white male getting into the car was a completely reasonable inference based on the presented evidence.

¶ 79    Defendant suggests that the State committed a "bait and switch" and presented Szwed as an expert, but at no point in closing or rebuttal did the State refer to Szwed as an expert. Furthermore, defendant has provided no reasoning and cited no case law in support of his argument that the State committed an improper "bait and switch." Therefore, we consider this argument waived. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (the argument section of appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and pages of the record relied on").

¶ 80    The cases on which defendant relies are distinguishable from the present case. See *People v. Beier*, 29 Ill. 2d 511 (1963); *People v. Giangrande*, 101 Ill. App. 3d 397 (1981). In *Beier*, the prosecutor in closing argued that " 'no fingerprints could be found' " and that the defendant " 'ha[d] the presence of mind at this time to use her skirt to wipe the fingerprints from that gun and to replace it.' " *Beier*, 29 Ill. 2d at 516. However, the supreme court found the prosecutor's comment was based on a mere assumption and therefore improper because there was no testimony or evidence presented "as to the presence or absence of fingerprints on the weapon" beyond the chief of police testifying that the gun "would ordinarily pick up fingerprints" and "could be readily wiped off of such material." *Id*. In *Giangrande*, the prosecutor argued in closing that the defendant's hair had been found on a piece of tape. *Giangrande*, 101 Ill. App. 3d at 402-03. However, there was no testimony that the hair found on the tape belonged to defendant; only that "three hair fragments removed from that tape could have originated from defendant." *Id*. at 403. Because the prosecutor overstated the evidence, and in conjunction with other improper comments from the prosecutor, the court found defendant suffered substantial prejudice. *Id*.

¶ 81    In contrast to both *Beier* and *Giangrande*, the prosecutor in the present case commented on the evidence exactly as it was presented to the jury and drew a reasonable inference that the testimony of Tellez was consistent with the testimony of Szwed. Accordingly, *Beier* and *Giangrande* are inapplicable to the present case.

¶ 82    Defendant also argues that the cumulative impact of the comments by the prosecutor denied him a fair trial. We disagree. "Where the alleged errors do not amount to reversible error on any individual issue, there generally is no cumulative error." *People v. Moore*, 358 Ill. App. 3d 683, 695 (2005). In the present case, we find no reversible error based on the State's closing and rebuttal arguments. Therefore, we find no plain error. See *Smith*, 372 Ill. App. 3d at 181.

¶ 83    Moreover, even if we found the State's comments in closing and rebuttal were improper, we still find defendant would be unable to show they rose to the level of plain error. As we have already discussed, the evidence at trial was not closely balanced. Both Patino and Gonzalez identified defendant as the shooter within a short amount of time after the shooting. Patino, Gonzalez, and Negrete all gave similar descriptions of the vehicle used in the shooting. Patino and Gonzalez then identified the vehicle used in the shooting just a few hours after the shooting. The vehicle was registered to defendant's mother, and defendant's DNA was found on the steering wheel, gearshift, driver's side door, and arm rest of the car. Finally, Tellez generally corroborated the other witness testimony: she heard shots and then saw a white man

- 24 -

get into the driver's side of a "light-colored vehicle" at the intersection where the shooting occurred.

¶ 84　　Defendant next contends that the evidence was insufficient to prove he shot Ulises and Negrete beyond a reasonable doubt. Specifically, defendant challenges the reliability of the identifications from Patino and Gonzalez.

¶ 85　　The standard of review on a challenge to the sufficiency of the evidence is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). When considering a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. *Id*. Rather, it is the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *Id*. The reviewing court will not substitute its judgment for that of the trier of fact on issues of witness credibility or the weight of the evidence. *Id*. at 224-25. A reviewing court will only reverse a conviction if the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 86　　Generally, identification by a single witness is sufficient to support a conviction if the defendant is viewed under circumstances permitting a positive identification. *People v. Gabriel*, 398 Ill. App. 3d 332, 341 (2010). In assessing the reliability of a witness identification, the well-established factors to consider are: (1) the witness's opportunity to view the defendant during the offense; (2) the witness's degree of attention at the time of the offense; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty at the subsequent identification; and (5) the length of time between the crime and the identification. *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989) (citing *Neil v. Biggers*, 409 U.S. 188 (1972)).

¶ 87　　Here, we find the identifications of defendant by both Patino and Gonzalez were sufficiently reliable. Patino testified that he noticed the vehicle, saw a Caucasian arm hanging out the driver's window of the car with a gun, heard a gunshot, then saw sparks. He recognized the driver as being defendant after the first shot and saw only defendant shooting. Patino said he was 40 to 45 feet away from the car at the time of the shooting, the sun was still out, the street lights had just started turning on, and nothing was blocking his view of defendant. Although he did not continue looking at the driver after the first shot, Patino testified that he knew defendant from around the neighborhood and did not waver from his identification of defendant as the shooter. The record also shows that shortly after the shooting, Patino told the police officers who arrived that Michael Temple, the defendant, was the shooter. Just a few hours later, Patino positively identified the vehicle that had been involved in the shooting and, soon after, he identified a photo of defendant as the shooter.

¶ 88　　Gonzalez testified that she saw the vehicle when Patino told her to watch out for the car. She saw defendant when Patino told her to watch out for the car. Gonzalez heard a gunshot coming from the driver's side of the car, then saw the gun being fired and a white male hand pointing out the driver's side window toward them. Gonzalez testified that she saw defendant's face for "[a] little more than half a minute" and that she was three, four, or five feet away from defendant when she saw his face. Gonzalez also testified she had seen defendant once or twice prior to the night of the shooting and nothing was blocking her view of defendant during the shooting. That same night, a few hours later, Gonzalez identified the car that had been used in

- 25 -

the shooting. Gonzalez then identified defendant in a lineup less than 30 hours after the shooting occurred and did not waver from her identification of defendant as the shooter. Both Patino and Gonzalez saw defendant for only a brief amount of time, but they both had unobstructed views of defendant, they both had seen defendant previously, and they both positively identified defendant as the shooter within a short period of time after the shooting.

¶ 89     Defendant challenges Gonzalez's identification of defendant in part on the fact that she did not identify defendant by name to the police even though she had a "prior acquaintance" with defendant and because she testified Patino told her "the shooter was Michael Temple." However, Gonzalez never testified that she knew defendant by name; she only testified that she had seen defendant once or twice prior to the night of the shooting, she had never spoken with him, and had never been in the same location with him for more than one minute. In addition, Gonzalez specifically testified that she identified defendant in the lineup because he was the person she "saw with [her] own two eyes."

¶ 90     Furthermore, defendant focuses on inconsistencies in the testimony between witnesses to support his claim that the identifications were insufficient to support his conviction and also questions the State's failure to explain why certain steps in the investigation were not taken; for example, why the detective only showed Patino a single photo of defendant but did not show Gonzalez the same photo. However, when considering a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. *Siguenza-Brito*, 235 Ill. 2d at 224. As we pointed out above, "[t]he weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." *Sutherland*, 223 Ill. 2d at 242. In addition, despite minor inconsistencies in the details, Patino and Gonzalez consistently and positively identified defendant as the shooter and they also consistently and positively identified the vehicle used in the shooting.

¶ 91     Moreover, as discussed above, here we find the evidence against defendant at trial was overwhelming. Patino and Gonzalez both testified that they had the opportunity to observe the shooter and identified defendant as the shooter: Patino informed the police that defendant was the shooter by name, then identified a photograph of defendant as the man Patino had seen firing on him and his friends, and Gonzalez identified defendant as the shooter in an in-person lineup. Patino, Gonzalez, and Negrete all testified to similar descriptions of the vehicle that was used in the shooting. On the night of the shooting, police located a vehicle that matched the provided descriptions near the area where the shooting occurred. Patino and Gonzalez viewed the vehicle that same night and identified it as the car that was used in the shooting. The testimony of Patino, Gonzalez, and Negrete was also corroborated by Tellez, who testified she heard shots, then went to her back door and saw a white man getting into the driver's side of a light-colored vehicle at the same intersection where the shooting occurred. The vehicle was registered to defendant's mother, and defendant's DNA was found on the steering wheel, gearshift, driver's side interior door handle, and armrest of the vehicle. Here, we cannot find that the evidence was so unreasonable, improbable, or unsatisfactory as to find a reasonable doubt of the defendant's guilt.

¶ 92     Finally, defendant contends that he was improperly convicted of two counts of first degree murder for the murder of Ulises Patino, and that he was improperly convicted of both the attempted murder and the aggravated battery with a firearm of Israel Negrete. The State correctly concedes both points.

¶ 93 Under the one-act, one-crime doctrine, a defendant cannot be convicted of more than one offense arising out of the same physical act. *People v. Miller*, 238 Ill. 2d 161, 165 (2010); *People v. King*, 66 Ill. 2d 551, 566 (1977). Accordingly, defendant should have only one conviction of first degree murder based on the murder of Ulises. In addition, both the State and defendant correctly agree that, here, the aggravated battery with a firearm is a lesser included offense of the attempted first degree murder. See *People v. Stuckey*, 231 Ill. App. 3d 550, 569 (1992) (finding that aggravated battery is a lesser included offense of attempted murder). "If an offense is a lesser-included offense, multiple convictions are improper." *People v. Miller*, 238 Ill. 2d 161, 165 (2010). Finally, when a defendant is convicted of multiple offenses arising from a single act, the conviction on the less serious offense should be vacated. *People v. Lee*, 213 Ill. 2d 218, 227 (2004). Therefore, pursuant to Illinois Supreme Court Rule 615(b)(1), we vacate defendant's conviction for first degree murder under count X and defendant's conviction for aggravated battery with a firearm under count XXXIV, and direct the clerk of the circuit court to correct the mittimus to reflect the same. See *People v. Gordon*, 378 Ill. App. 3d 626, 642 (2007) (correcting the mittimus to reflect proper convictions).

¶ 94 For the foregoing reasons, we affirm the judgment of the trial court as to defendant's convictions and sentences for one count of first degree murder and one count of attempted murder, we vacate the convictions and sentences for one count of first degree murder and aggravated battery with a firearm, and direct the mittimus to be corrected as indicated.

¶ 95 Affirmed in part and vacated in part; mittimus corrected.