NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 160882-UB

NO. 4-16-0882

FILED
May 2, 2022
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| HAYZE L. SCHOONOVER, | ) | No. 15CF1388 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) Defendant failed to establish that his defense counsel provided ineffective
assistance.

(2) The trial court did not abuse its discretion at sentencing.

¶ 2     Following a jury trial, defendant, Hayze L. Schoonover, was found guilty of three

counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)) and

sentenced to two 35-year terms and one 15-year term of imprisonment. Defendant appealed his

convictions and sentences, arguing (1) the trial court violated his right to a public trial by barring

members of his family from the courtroom during the minor victim's trial testimony, (2) his

defense counsel provided ineffective assistance, and (3) the court abused its discretion during

sentencing.

¶ 3     In April 2019, a majority of a panel of this court found the trial court failed to

comply with section 115-11 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-11 (West 2014))—which permits limited courtroom closures during the testimony of minor victims of certain sex crimes—and violated defendant's right to a public trial. See *People v. Schoonover*, 2019 IL App (4th) 160882, ¶ 45, 158 N.E.3d 253. We reversed and remanded for a new trial on that basis without addressing the remaining issues raised by defendant on appeal. *Id.* ¶¶ 45, 56. The State petitioned for and was granted leave to appeal. In December 2021, the supreme court reversed, finding no clear or obvious error under section 115-11 of the Code or of defendant's right to a public trial. *People v. Schoonover*, 2021 IL 124832, ¶ 54. It remanded the matter back to this court to address defendant's remaining claims of error. *Id.* ¶ 52. We now affirm the trial court's judgment.

¶ 4                                I. BACKGROUND

¶ 5          In September 2015, the State charged defendant with four counts of predatory criminal sexual assault of his niece, M.L. 720 ILCS 5/11-1.40(a)(1) (West 2014). Specifically, it alleged that defendant, who was over the age of 17, committed "act[s] of contact" with M.L., who was under the age of 13, for the purpose of defendant's sexual gratification, in that defendant touched M.L.'s vagina with his hand (count I), touched M.L.'s breasts with his hand (count II), placed his penis in M.L.'s mouth (count III), and placed his penis in M.L.'s hand (count IV).

¶ 6          Prior to defendant's trial, the State moved, pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2014)), to admit statements M.L. made to family members and police officers about the alleged sexual assaults, as well as a recording of an interview with M.L. at the Child Advocacy Center (CAC). The trial court allowed the motion over defendant's objection.

¶ 7          Defendant also filed various pretrial motions, including a motion *in limine* to bar the State from presenting evidence of statements M.L. made to her minor cousin, A.G., about the

- 2 -

alleged offenses. In response to the motion, the State asserted A.G. would not be called to testify but she would "be mentioned because she was the trigger that brought [the alleged offenses] to the family's attention[.]" It represented, however, that it did not intend to talk about "specific statements" M.L. made to A.G. The trial court ruled the State would be permitted to present evidence that a conversation occurred between M.L. and A.G., but not its content.

¶ 8         In August 2016, defendant's jury trial was conducted. Evidence showed M.L. was born in October 2002, and 13 years old at the time of trial. She testified defendant was married to her maternal aunt, Sarita Taylor, and the couple had two children. When M.L. was 10 or 11 years old, she would spend the night at defendant and Sarita's house. She would stay up late watching movies with defendant after everyone else went to bed. When M.L. was 12 years old, defendant began talking to her about "sex things." He also showed M.L. videos on his computer of people "doing sexual stuff." M.L. recalled that defendant asked her to go into the bathroom, take her clothes off, and take pictures of her "private areas" with his phone.

¶ 9         M.L. stated that on two or three occasions, defendant "did touch [her] down there." She recalled one instance when defendant put on a blue "doctor's glove" and touched her vagina, indicating that his intention "was to identify what everything was down there." On another occasion, defendant "made [M.L.] put his penis in [her] mouth." M.L. asserted defendant called her into his bedroom and, when she entered the room, defendant "was laying on the bed with his penis out." At defendant's request, M.L. put his penis in her mouth. M.L. testified defendant "had a tattoo down by his penis." She provided a description of the tattoo, including its design, coloring, and location. M.L. also identified photographs of the tattoo. The record shows defendant stipulated that the photographs shown to M.L. were of his body. The photographs were admitted into evidence and shown to the jury.

¶ 10        M.L. estimated that defendant asked her to put his penis in her mouth three or four times during the span of a year. Further, she asserted that on more than three or four occasions, defendant made her touch his penis with her hand. M.L. denied that defendant ever touched her breasts.

¶ 11        M.L. maintained that when she was alone with defendant, there were times he offered her "weed." She stated, "a couple of times," she "smoked weed" with defendant using a "pipe" in the kitchen or the garage. Defendant also gave M.L. alcohol to drink. Specifically, she stated she was given "something with whiskey" and a drink that she believed was called "Twisted Apple Ale."

¶ 12        M.L. further testified that defendant cautioned her not to tell anybody about what happened between them. Defendant told her "he could get in very big trouble." He also threatened to kill M.L., stating that telling someone "would cause [*sic*] [M.L.] her life." Eventually, M.L. told her cousin, A.G., what had happened with defendant. Later, she also disclosed what happened with defendant to other family members while at her grandfather's house. M.L. stated her family questioned her about what occurred with defendant but she did not recall the specific questions she was asked. Approximately a week after she disclosed information to her family, M.L. spoke with a woman at the CAC.

¶ 13        The State's evidence showed M.L.'s disclosures at her grandfather's residence occurred in September 2015. Cashonna Berger testified that M.L. was her niece and A.G. was her daughter. Around September 10, 2015, Cashonna had a conversation in her car with A.G., who was then 13, about M.L. Following that conversation, Cashonna contacted William Taylor, her father and M.L.'s grandfather, and told him "it would be a good idea to have a conversation with" M.L. and M.L.'s mother, Caitlin Taylor. On September 13, 2015, the family members met at

William's residence. Initially present at the meeting were William, Caitlin, M.L., Cashonna, and A.G. Later, Sarita also arrived at the residence.

¶ 14    Each adult present at the family meeting testified and described what occurred during the meeting. Evidence showed William began the conversation with M.L. by stating there were cameras in Sarita and defendant's house. William testified he asked M.L. if there was anything she needed to talk to him about and maintained that he asked M.L. open ended questions in an effort to obtain information. He stated M.L. reported "that there had been some touching going on." She also admitted "that there was some oral sex involved." William stated that during their conversation, M.L. "broke into tears" and "got really upset."

¶ 15    Cashonna recalled that during questioning by William, M.L. admitted that defendant had touched her. She testified M.L. also described an instance when she performed oral sex on defendant while she sat in a desk chair in front of a computer and defendant stood in front of her. M.L. reported that during that incident, "something landed on her face." Caitlin testified M.L. "admitted that [defendant] touched her" and reported that defendant "put his private areas in her mouth."

¶ 16    After Sarita arrived at William's residence, she spoke with M.L. and asked, " '[i]s there anything about [defendant] that is identifiable' " and " 'is there any marks.' " Sarita maintained she did not say or volunteer the word "tattoo." M.L. responded to her questions by mentioning the tattoo on defendant's pubic area, which she then described. Following that conversation, Sarita recommended that her family call the police.

¶ 17    Around 6:45 p.m. on the day of the family meeting, police officers arrived at William's residence. Officer Michael Martinez testified he responded to the residence and spoke with M.L., asking "if she could elaborate on some of the statements that she made to her

grandfather." According to Martinez, M.L. disclosed that defendant had touched her approximately two times "underneath her garments" and "on her vagina." M.L. further reported that she had "been forced to perform oral sex on three occasions, and had been forced to touch [defendant's] penis once." Martinez testified that when talking about the alleged sexual acts, M.L. "was visibly shaken and trembling, [and] crying at times."

¶ 18       Officer Ryan Umberger testified that on September 14, 2015, the day after the family meeting, he returned to William's residence. His purpose was to speak to M.L. about "any identifying marks" on defendant. Umberger stated he specifically asked M.L. if defendant "had any identifying marks that she could describe to [him]." M.L. responded that defendant "had a tattoo on his penis area." She also provided descriptions of what the tattoo looked like and its specific location.

¶ 19       Mary Bunyard testified she was a child forensic interviewer for the CAC. On September 25, 2015, she interviewed M.L. A recording of the interview was admitted into evidence and played for the jury. During the interview, M.L. stated she was then 12 years old. She and Bunyard initially discussed topics unrelated to the alleged offenses, including M.L.'s family and her school-related activities. M.L. stated she was "not doing so well in school right now because of the issues." She stated she knew she could do better but "[i]t's just really hard with all the people that bully me and the issues I'm going through with old friends." M.L. agreed with Bunyard that there could be "girl drama" in middle school.

¶ 20       Regarding the alleged offenses, M.L. stated it was her understanding she was being interviewed because defendant, who was her uncle, "was being very nasty to [her]." She described events that occurred when she would spend the night at defendant's house when she was 11 and 12 years old. She stated defendant began by talking to her about sexual things. M.L. reported

instances when defendant showed her videos of people having sex on his computer. She also stated that he had her take pictures of herself in the bathroom without clothing using his phone. M.L. recalled one instance when defendant made her lay down on the kitchen floor without clothing, stating he was "going to look at [M.L.] and tell [her] what everything is." M.L. reported that defendant touched her "private," meaning her vagina. She stated he also touched her "boobs." On another occasion, defendant touched the outside of her "private part" while wearing gloves. M.L. stated there were three occasions when defendant had her put her mouth on his penis. The incidents occurred at night while other adults in the house were sleeping or at work.

¶ 21         M.L. also told Bunyard that there were times defendant gave her "apple ale" to drink and a "pipe with weed in it" to smoke. She stated defendant talked with her about "sex toys" that he used with M.L.'s aunt and that he showed a "sex toy" to her. M.L. further reported that defendant threatened to kill her if she told anyone about what was happening. Nevertheless, M.L. ultimately talked with her cousin about defendant. When Bunyard asked M.L. if there was anything "descriptive" about defendant, M.L. responded "his penis." She then described the tattoo he had on his pubic area.

¶ 22         The record reflects that during defense counsel's cross-examination of Cashonna, she acknowledged that she was the one who started the conversation with A.G., which prompted the family meeting with M.L. Defense counsel then asked Cashonna whether it was correct that "nothing [A.G.] described involved [M.L.] or [defendant] having physical contact." The State objected to "anything [A.G.] said," noting her statements had been the subject of one of defendant's pretrial motions *in limine*. The trial court overruled the objection, stating defense counsel "may ask if he wants." Counsel then elicited testimony from Cashonna that A.G. did not report anything "specific about physical contact between [defendant] and [M.L.] that day[.]"

¶ 23    On redirect examination, Cashonna testified that her conversation in the car with A.G. was prompted by her husband's "concern" that "something seemed a little off" with defendant's relationship with M.L. Cashonna testified she then spoke with A.G., who reported an occasion when defendant followed her into the bathroom and talked to her about sex and sex toys and "he brought out sex toys" that he showed to A.G. Defense counsel objected on the basis of "speculation," and the State responded that defense counsel had opened the door with his questioning of the witness. The trial court overruled the objection. The following colloquy then occurred:

"Q. Based on that, why did you decide to have a meeting with [M.L.]?

A. Because then after [A.G.] had explained that to me, I had asked her if [M.L.] had ever told her anything that we needed to be concerned about with her— with her relationship between [M.L.] and [defendant].

MR. ALLEGRETTI [(DEFENSE ATTORNEY)]: Objection, Judge; hearsay.

MR. LARSON [(ASSISTANT STATE'S ATTORNEY)]: He has once again opened the door to this, Your Honor.

THE COURT: Mr. Allegretti, you asked a question about this conversation. I will allow redirect on it.

MR. LARSON: Thank you, Your Honor.

Q. I'm sorry. If you—so after your daughter told you about the incident with the sex toy, and then you asked her about [M.L.], what did she say to you?

A. She said that it would be a good idea to speak with [M.L.] because she believed that much more had happened between [defendant] and [M.L.]"

¶ 24        At trial, Sarita further testified that she had been married to defendant for eight years. In August or early September 2015, she filed for divorce. Sarita confirmed that in 2014 and 2015, M.L. would often spend the night at her and defendant's home. Sarita estimated that M.L. stayed at her home once or twice a month. On some of the nights M.L. was there, Sarita was at work. Other times, Sarita and her children would go to bed while defendant and M.L. stayed up watching television. At the time, defendant, who was born on December 14, 1986, would have been about 28 years old.

¶ 25        Sarita acknowledged that she and defendant had cameras in their home. They also kept alcohol, including "Canadian Superior whiskey" and "apple ale," and defendant had marijuana with multiple "pipes" that he used. Over defense counsel's relevance objection, Sarita was permitted to testify about, and describe, "sex toys" that defendant purchased and had in the home. Further, she testified that while she was living with defendant, he got a tattoo on his "pubic area." Sarita also identified photographs depicting that tattoo.

¶ 26        Sarita testified there were times defendant showed her pornography, some of which was from the internet and on his computer. The same day as the family meeting, she checked the computer in her house because M.L. mentioned there was a file on the computer "that had a password and pictures." Sarita stated she found a file she could not open. Later, she showed the police the file and gave them the computer. The State's evidence showed the computer was analyzed by the police and a file was found that could not be opened.

¶ 27        Finally, Sarita also testified that approximately a week after the family meeting in September 2015, she discovered a black notebook in her house that had a handwritten conversation inside with two different handwritings. The notebook had been located on her kitchen bar in a stack of papers and bills. Over defendant's objection, the black notebook was entered into

- 9 -

evidence. The State further introduced copies of the handwritten conversation from the notebook, which were also admitted into evidence over defendant's objection. Sarita identified one of the handwritings from the conversation as belonging to defendant, which she then highlighted on the copied pages of the notebook. She acknowledged on cross-examination that defendant had not been living in the home since August 2015, and that she had filed for a divorce from him that same month.

¶ 28        Following Sarita's testimony regarding the black notebook, the State recalled M.L. as a witness. M.L. testified she recognized the black notebook, as well as the handwriting it contained. She stated she wrote in the notebook while in Sarita and defendant's kitchen. M.L. asserted defendant gave her the notebook to write in and that he also wrote in the notebook.

¶ 29        The record reflects the handwriting from the black notebook that was attributed to defendant included the following statements: (1) "you should take off your bra and underwere [*sic*]?"; (2) "would you like another ciggy?"; (3) "what you have is very nice and I would love be [*sic*] the first one to do that."; (4) "I don't think you will want to because you won't take off your underwere [*sic*]"; (5) "about licking it. Is there anything else you want to do?" (6) "If I clean it do you want to do what we did last time again but soft not hard?"; (7) "will you go take some pics while I clean it? You should let me show you what all the parts of your stuff is! I will were [*sic*] a glove and not put anything in you?"; (8) "I want to see it and you should know what it is[.]"

¶ 30        The jury found defendant guilty of three counts of predatory criminal sexual assault of a child—counts I, III, and IV. In September 2016, defendant filed a motion for a new trial.

¶ 31        In October 2016, the trial court denied defendant's posttrial motion and conducted his sentencing hearing. The record shows the trial court stated it received and considered defendant's presentence investigation report (PSI), "a mitigation packet" containing letters in

support of defendant from his friends and family, as well as victim impact statements from M.L. and her mother. The PSI showed defendant's criminal history included several traffic-related offenses and a 2007 conviction for driving under the influence. It further showed defendant was a high school graduate and that he and Sarita had two children. From 2011 to 2015, defendant did not work and stayed at home with his children. In June 2015, he began working at a Meijer store in Champaign, Illinois, and continued working there until September 2015, when he lost his job for having "excessive absences due to mandatory court appearances in his *** divorce case as well as an Order of Protection matter." The PSI identified defendant's children as being six and four years old and stated they currently resided with their mother.

¶ 32    In aggravation at sentencing, Sarita testified that her family had been greatly affected by defendant's actions. She asserted her family previously spent a lot of time together and "used to get along." Currently, however, everything was "strained" and "uncomfortable."

¶ 33    Defendant's father, Sam Schoonover, testified in mitigation. He noted that defendant's mother died when defendant was eight or nine years old. Sam stated defendant was a talented welder and artist. He identified pictures of defendant's artwork and explained how defendant and his stepbrother had designed and helped build a park pavilion in the community where he lived. Sam also testified that defendant had been a stay-at-home dad for his two children and "only had a couple jobs out of the house." He maintained that the last time he visited with defendant's children, they asked about defendant.

¶ 34    The State recommended the trial court sentence defendant to 40 years in prison for each of the three counts of predatory criminal sexual assault, totaling 120 years in prison. It argued such a sentence was necessary to send a message to others and to stop defendant from harming someone again. Defendant's counsel asked the court to sentence defendant to only 30 years in

prison. He argued defendant did not have a serious criminal history and asserted that imprisonment would "be an excessive hardship to [defendant's] dependents." Counsel asserted defendant's children "still ask about him today" and noted that he had been a stay-at-home father. Counsel also emphasized the many letters submitted on defendant's behalf, which spoke favorably of defendant's character.

¶ 35        As stated, the trial court sentenced defendant to two 35-year prison terms (counts I and III) and one 15-year prison term (count IV). The court ordered the sentences to be served consecutively for a total of 85 years in prison. In setting forth its ruling, the court stated it had considered the evidence presented as well as the statutory factors in aggravation and mitigation. The court found there was mitigation on the record, although "not necessarily statutory mitigation." However, it also noted that defendant had a minimal criminal history, which it found to be a mitigating factor.

¶ 36        The trial court determined the only statutory factor in aggravation was "the deterrent factor." It further stated as follows:

> "The [d]efendant's family, his friends have submitted letters and indicated what a good person he is, but that is the disguise of a sexual predator. They don't wear a sign around their neck. They don't have some indication that I am a child molester. They're otherwise good people. They're solid citizens. They have jobs, they have an education. All of which is to cover what they do in private with a child or with children. So the fact that family members think highly of the Defendant and are having a hard time understanding either what he did or whether or not he did it, that is the nature of child molesters. What they do, they do in private, It's not done in public. They're not easily identifiable. As a matter of fact, they're hardly ever

identified until after the fact has been—after they've been arrested and/or charged. So the sentence imposed today has to act as an appropriate deterrent factor for all the other molesters who are out there."

¶ 37 Defendant filed a motion to reconsider his sentence. In November 2016, the trial court conducted a hearing and denied the motion.

¶ 38 This appeal followed.

¶ 39                                    II. ANALYSIS

¶ 40                          A. Ineffective Assistance of Counsel

¶ 41 On appeal, defendant first argues his defense counsel provided ineffective assistance. Specifically, he complains that his counsel (1) improperly opened the door to prejudicial and inadmissible testimony from Cashonna regarding communications between M.L. and A.G.; (2) failed to properly object to Cashonna's testimony regarding A.G.'s hearsay statements about the interaction A.G. reported with defendant in a bathroom; (3) failed to properly object to portions of M.L.'s recorded CAC interview, during which she stated she was being bullied at school; and (4) failed to object to the admission of M.L.'s written hearsay statements in the black notebook.

¶ 42 To establish an ineffective-assistance-of-counsel claim, a defendant must show that his or her attorney's performance (1) fell below an objective standard of reasonableness and (2) caused the defendant prejudice "in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Jackson*, 2020 IL 124112, ¶ 90, 162 N.E.3d 223 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Because the defendant must satisfy both prongs of this test, the failure to establish either [deficient performance or prejudice] is fatal to the claim." *Id.*

¶ 43        As to prejudice, "[a] 'reasonable probability' is defined as 'a probability sufficient to undermine confidence in the outcome.' " *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601 (quoting *Strickland*, 466 U.S. at 694). "Thus, the defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *People v. Smith*, 195 Ill. 2d 179, 188, 745 N.E.2d 1194, 1200 (2000). "If a defendant cannot establish that he suffered prejudice, a court need not determine whether counsel's performance was constitutionally deficient." *Id.*

¶ 44        Here, we agree with the State that defendant's ineffective-assistance claims may be resolved based on a lack of prejudice. In arguing that he suffered prejudice, defendant asserts that the State's primary evidence against him was "the testimony of one child witness, M.L." He suggests M.L.'s testimony lacked credibility or was entitled to only limited weight because her "statements were not spontaneous" and were "only provided after being questioned by adults." Defendant notes the testimony of other witnesses at trial essentially amounted to a "retelling" of M.L.'s non-spontaneous allegations against him. He also argues that evidence that he and Sarita were "recently divorced" established Sarita's bias against him, reflecting negatively on her credibility. Defendant asserts that if it were not for his defense counsel's deficient performance, which resulted in the admission of A.G.'s hearsay statements, "the State would have been barred from admitting Sarita's testimony regarding the sex toys." Further, he contends that M.L.'s statements during the CAC interview "about being bullied at school due to the alleged offense" were prejudicial to him because they constituted "an improper appeal to the emotions of the jurors."

¶ 45        Here, M.L. testified clearly regarding the sexual acts perpetrated against her by defendant. While defendant claims the allegations she raised against him were not spontaneously

made, M.L.'s own testimony showed that she first disclosed defendant's alleged assaults to A.G., her minor cousin. Significantly, the evidence showed that a conversation between A.G. and her mother ultimately prompted the family meeting with M.L., during which M.L. then made disclosures to her mother, grandfather, and aunts. Additionally, the record reflects M.L. provided substantially similar accounts of the alleged assaults at trial, to her family members, to the police, and during the CAC interview. She was able to accurately describe the tattoo located on defendant's pubic area. Also, she consistently reported that defendant started discussing sexual matters with her before the alleged sexual assaults occurred and that he asked her to take naked photos of herself. M.L.'s testimony regarding defendant's opportunity to commit the crimes, defendant offering her alcohol and marijuana, and the pornography on defendant's computer were all supported by Sarita.

¶ 46    We also find compelling circumstantial evidence of defendant's guilt was presented through his handwritten statements in the black notebook. The handwriting in the black notebook attributed to M.L. consisted of few-word responses to the statements attributed to defendant. The most significant and damaging portions of the handwritten conversation were the statements purportedly written by defendant, the admission of which he does not challenge on appeal. M.L. testified defendant wrote in the black notebook and Sarita identified the statements in defendant's handwriting. M.L.'s testimony further supports the inference that the handwritten statements attributed to defendant were directed at her. Defendant's statements strongly corroborated M.L.'s descriptions of her interactions with him. Specifically, the statements suggest defendant (1) requested oral sex from M.L., (2) asked M.L. to remove her clothing and take pictures of herself, (3) expressed that he wanted to help M.L. by identifying parts of her anatomy, and (4) wore a glove during their interactions.

¶ 47    Under these circumstances, defendant was not prejudiced by any of the alleged improperly admitted evidence. A.G.'s hearsay statements were insignificant in light of the properly admitted evidence of defendant's guilt, and the admission of those statements do not undermine confidence in the outcome of defendant's trial. Additionally, we note the issue of "sex toys" in defendant's possession was not solely introduced through A.G.'s hearsay statements. Rather, during her CAC interview, M.L. also reported that defendant discussed the subject of "sex toys" with her and showed her a "sex toy" he had in his possession. Thus, Sarita's testimony regarding the "sex toys" in her and defendant's home helped further corroborate M.L.'s statements.

¶ 48    Additionally, as indicated above, M.L.'s hearsay statements from the black notebook were negligible, consisting of short responses to defendant's far more incriminating handwritten statements. The real evidentiary value from the black notebook came from the statements attributed to defendant. Again, defendant does not challenge the admission of his handwritten statements on appeal.

¶ 49    Further, as noted, defendant also raises complaints regarding M.L.'s statements during the CAC interview about being bullied. He asserts her comments pertained to the underlying offenses and were prejudicial to him because they appealed to jurors' emotions. However, the complained-of statements were brief and limited to only a small portion of the recorded interview. Further, the record does not clearly support a finding that the bullying M.L. reported was due to her involvement in the underlying case. Instead, before talking about alleged offenses, Bunyard asked M.L. general questions about herself, including questions about M.L.'s schooling. M.L. stated she was not doing well in school because of "the issues." She further stated that she knew she could do better but "[i]t's just really hard with all the people that bully me and the issues I'm going through with old friends." Nothing in M.L.'s statements explicitly relate either

- 16 -

her poor school performance or being bullied to the incidents involving defendant. Consequently, we find no prejudicial appeal to the jurors' emotions.

¶ 50    Here, even assuming defense counsel's performance was deficient as defendant alleges on appeal, the record does not support a finding of *Strickland* prejudice. The evidence against defendant was strong, and the evidence he argues was improperly admitted was inconsequential. We find a lack of prejudice both when defendant's claimed errors are considered individually or cumulatively. Accordingly, defendant's ineffective-assistance claims lack merit.

¶ 51    We note defendant additionally argues his claims of error, although not properly preserved for review, are reviewable under the plain-error doctrine.

"The plain error doctrine is applicable when a clear or obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant (first-prong plain error) or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process (second-prong plain error)." *Schoonover*, 2021 IL 124832, ¶ 27.

¶ 52    First, we note "[p]lain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced." *People v. White*, 2011 IL 109689, ¶ 133, 956 N.E.2d 379. Further, "[w]hen it is clear that the alleged error would not have affected the outcome of the case, a court of review need not engage in the meaningless endeavor of determining whether error occurred." *Id.* ¶ 148. For the reasons already stated, we find the record contains strong and compelling evidence of defendant's guilt and the evidence was not closely balanced. Thus, even assuming error occurred as alleged by defendant, he cannot establish

the occurrence of first-prong plain error.

¶ 53 Second, defendant's arguments on appeal also fail to establish second-prong plain error. "Under the second prong of plain-error review, [p]rejudice to the defendant is presumed because of the importance of the right involved, regardless of the strength of the evidence." (Emphasis and internal quotation marks omitted.) *People v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403, 413 (2010). However, as noted by the State, the supreme court has "equated the second prong of plain-error review with structural error[.]" *Id.* "An error is typically designated as structural only if it necessarily renders a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." *Id.* at 609. The supreme court has recognized errors as being structural in only a limited class of cases, including those involving "a complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction." *Id.*

¶ 54 Here, the types of errors alleged by defendant concern the erroneous admission of hearsay and irrelevant evidence at trial. We agree with the State that defendant's claimed errors, neither individually nor cumulatively, rise to the level of structural error. See *People v. Temple*, 2014 IL App (1st) 111653, ¶ 51, 14 N.E.3d 622 (finding the errors the defendant complained of— "admission of prior consistent statements, hearsay testimony from police officers going beyond the scope of explaining police procedure, and prosecutorial misconduct in closing and rebuttal arguments"—did not "fall under the umbrella of structural error").

¶ 55 B. Sentencing

¶ 56 On appeal, defendant next argues the trial court abused its discretion during his sentencing. He contends the court improperly "applied a personal sentencing policy" and failed to give proper weight to a statutory mitigating factor—the excessive hardship defendant's

imprisonment would have on his dependents.

¶ 57        "The Illinois Constitution provides penalties are to be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." *People v. Daly*, 2014 IL App (4th) 140624, ¶ 26, 21 N.E.3d 810 (citing Ill. Const. 1970, art. I, § 11). "This constitutional mandate calls for balancing the retributive and rehabilitative purposes of punishment, and the process requires careful consideration of all factors in aggravation and mitigation." *Id.*

¶ 58        Additionally, "[t]he trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212, 940 N.E.2d 1062, 1066 (2010). "The trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Fern*, 189 Ill. 2d 48, 53, 723 N.E.2d 207, 209 (1999). On review, a defendant's sentence may not be altered absent an abuse of discretion by the trial court. *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656. "A sentence will be deemed an abuse of discretion where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *Alexander*, 239 Ill. 2d at 212.

¶ 59        As defendant points out, "[c]ourts of review have reversed and remanded for resentencing where it has been shown trial judges have sentenced individuals based upon what is referred to as a 'personal sentencing policy.' " *People v. Scott*, 2015 IL App (4th) 130222, ¶ 46, 25 N.E.3d 1257; see also *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 55, 141 N.E.3d 320 (stating "the trial court may not have a personal sentencing policy that fails to conform to the standards of the Unified Code"). Here, defendant contends the trial court was of the opinion "that

'child molesters' could not, apart from their offense, be good people or do good things," resulting in a personal sentencing policy that "disallow[ed]" the court "from considering mitigating evidence for child sex offenders."

¶ 60       Defendant maintains the present case is comparable to the supreme court's decision in *People v. Bolyard*, 61 Ill. 2d 583, 338 N.E.2d 168 (1975). There, the defendant was convicted of indecent liberties with a child and, although probation was an available sentence, the trial judge "expressed his opinion that perpetrators of such a crime should not receive probation." *Id.* at 585-87. The supreme court determined the defendant was entitled to a new sentencing hearing because the record affirmatively showed "the trial judge arbitrarily denied probation because [the] defendant fell within the trial judge's category of disfavored offenders." *Id.* at 587.

¶ 61       We find *Bolyard* distinguishable from the case at bar. At sentencing, defendant submitted several letters from family and friends that spoke positively about his character. Defense counsel emphasized those letters when presenting argument to the trial court. In setting forth its ruling, the court commented on the letters, stating that although they indicated defendant was a good person, individuals who commit child sex offenses do so in private and are not easily identifiable. Immediately following those comments, the court explained that its sentence had "to act as an appropriate deterrent factor for all the other molesters who are out there." When taken in context, the court's comments do not reflect a refusal to consider mitigating evidence. Rather, the record shows the court was responding to defense counsel's arguments and providing an explanation of the weight it was attributing to the evidence before it.

¶ 62       The trial court's comments show that it did consider the mitigating evidence defendant presented, *i.e.*, the letters written on his behalf. Ultimately, however, the court applied little weight to that evidence when compared to other factors, including the seriousness of the

offenses and the need for deterrence. Accordingly, we find no error as alleged by defendant.

¶ 63        As stated, defendant also argues the trial court abused its discretion by failing to consider and give proper weight to a statutory factor in mitigation, *i.e.*, that "the imprisonment of the defendant would entail excessive hardship to his dependents." 730 ILCS 5/5-5-3.1(a)(11) (West 2016). Defendant argues on appeal that the evidence showed he was "the primary caretaker of his children as a stay-at-home dad." He contends that "[d]ue to the cost of daycare, a long incarceration would have presented excessive hardship on [his] dependents."

¶ 64        Although it is required that a sentencing court consider statutory factors in mitigation and aggravation, "the court need not recite and assign a value to each factor it has considered." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38, 92 N.E.3d 494. "[W]hen mitigating factors are presented to the court, we presume that the trial court considered them, absent some contrary evidence." *People v. Zarka-Nevling*, 308 Ill. App. 3d 516, 526, 720 N.E.2d 334, 341 (1999).

¶ 65        Here, the trial court explicitly stated that it had considered statutory factors in aggravation and mitigation. As stated above, the court was not required to recite and assign value to each factor. Further, scant evidence was presented at sentencing regarding any "excessive" hardship to defendant's children. Defendant's PSI showed that between 2011 and 2015, he did not work and stayed home to provide care for his and Sarita's children. However, in June 2015, prior to the underlying charges in this case, defendant began working outside the home. At the time the PSI was filed, the children were residing with Sarita. No other evidence was presented regarding the children's specific circumstances or "the cost of daycare." Moreover, defendant fails to explain how this factor would be relevant to a lesser sentence of 30 years, which his counsel recommended at sentencing, when his children would have reached majority well before his release from prison.

Under such circumstances, it was not an abuse of discretion for the trial court to find this factor inapplicable.

¶ 66                                III. CONCLUSION

¶ 67          For the reasons stated, we affirm the trial court's judgment.

¶ 68          Affirmed.